**Thomas C. RAMSEUR, Appellant,**

v.

**Howard C. BEYER, Superintendent, New Jersey State Prison, Robert Del Tufo, New Jersey Attorney General.**

No. 90–5333.

United States Court of Appeals, Third Circuit.

Argued Nov. 19, 1991.

Reargued Sept. 10, 1992.

Decided Dec. 31, 1992.

Matthew Astore (argued), State of N.J., Dept. of the Public Advocate, Office of the Public Defender, Newark, N.J., for appellant.

Hilary L. Brunell (argued), Legal Asst., Appellate Section, Office of the County Prosecutor, Newark, N.J., for appellee.

Argued Nov. 19, 1991.

Before: MANSMANN, COWEN and ROTH, Circuit Judges.

Reargued Sept. 10, 1992.

Before, SLOVITER, Chief Judge, and STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, and ROTH, Circuit Judges.

## OPINION OF THE COURT

ROTH, Circuit Judge.

During the selection of the grand jury which indicted appellant, Thomas Ramseur, the assignment judge, through statements and actions, treated certain African–American members of the venire differently because of their race. There is, however, nothing in the record to indicate any actual exclusion from appellant's grand jury of African–American jurors on account of their race. This appeal requires us to address the difficult question of whether these events comprise a constitutional violation. We must also determine whether the grand and petit juries that tried and convicted the appellant were drawn from lists that unconstitutionally underrepresented African–Americans and whether the procedures used in Essex County, New Jersey, to select grand jury forepersons violated the Equal Protection Clause of the Fourteenth Amendment or the Sixth Amendment's guarantee of a trial by a jury drawn from a cross-section of the community. Finally, we must determine whether misconduct by the prosecutor in this case denied appellant his constitutional right to a fair trial. Appellant, Thomas Ramseur, has advanced these grounds in his petition for a writ of habeas corpus. The district court denied his petition. For the reasons that follow, we will affirm the denial of the petition but will do so for the reasons we state below.

I.

On May 12, 1983, a jury found Thomas Ramseur guilty of the murder of Asaline Stokes, his former girlfriend. He was convicted on all counts charged in the indictment against him: (1) murder (N.J.S.A. 2C:11–3); (2) unlawful possession of a knife under circumstances not manifestly appropriate for lawful use (N.J.S.A. 2C:39–5d); and (3) unlawful possession of a knife with the purpose of using it against another (N.J.S.A. 2C:39–4d). Following the sentencing phase of the bifurcated trial, the jury rendered a sentence of death that was imposed by the trial court on June 17, 1983.

On March 5, 1987, the New Jersey Supreme Court affirmed Ramseur's convictions on all counts but reversed his death sentence. *See State v. Ramseur*, 106 N.J. 123, 524 A.2d 188 (1987). Ramseur then filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the U.S. District Court for the District of New Jersey.[1] On March 14, 1990, the district court denied Ramseur's petition for a writ of habeas corpus. This appeal followed. We have jurisdiction over this appeal pursuant to 28

---

1. Before the district court, the petition for habeas corpus was based in part on the assumption that two jurors had been excluded from the grand jury panel on the basis of race. It was only during oral argument before the panel of this Court that we were advised that these two jurors had in fact ultimately been seated and served on the grand jury panel.

U.S.C. §§ 1291, 2253. Our scope of review of a district court's conclusions of law with regard to a state prisoner's petition for a writ of habeas corpus is plenary. *See Humanik v. Beyer*, 871 F.2d 432, 435 (3d Cir.1989), *cert. denied*, 493 U.S. 812, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989).

## II.

The crux of Ramseur's complaint is that the procedure used to empanel grand jurors in Essex County violated his right to equal protection of the laws under the Fourteenth Amendment. Resolving this issue requires a close examination of the procedure used to empanel grand juries in the county prior to and at the time of Ramseur's indictment.

We will describe in Part III how the juror source lists were created in Essex County, panels of qualified jurors selected from those lists, and summonses sent to persons randomly designated for the grand jury panels. Many potential jurors, upon receipt of the summons to jury service and the realization that grand jury service would last for a six week period, would submit a written request for an excuse. The clerk's office would screen these excuses and meritorious requests would be granted before the jurors actually appeared for service. Prior to the assembly of the venire, the assignment judges for Essex County would review the letters and questionnaires received. At the actual selection, the assignment judges would question each juror and reconsider the excuses previously requested but denied.

The assignment judge who empaneled Ramseur's grand jury used the following procedure once the venire was assembled: First, the judge briefly interviewed each juror. Then he did one of three things: excused the juror for cause, asked the juror to take a seat in the body of the courtroom for the time being, or asked the juror to take a seat on the panel. Those he asked to sit in the body of the courtroom fell into one of two groups. The first group consisted of those persons who had asked to be excused but whose excuses had been denied. They were asked to sit in the body of the courtroom with the understanding that they might be called upon to serve later, after all of the other prospective jurors had been questioned. The second group consisted of persons who proffered no excuse, stated they were willing to serve, but were nonetheless asked to sit aside.

In the course of empaneling Ramseur's grand jury, the judge announced that he was attempting to "pick a cross section of the community" to serve on the grand jury. App. at 2429. Later, he asked Esther Catagen, app. at 2447, and George Smith, app. at 2438, to sit in the body of the courtroom although both had stated they were willing to serve. When the assignment judge reached Betty Patrick, the forty-third prospective juror in the selection of Ramseur's grand jury, Ms. Patrick indicated that she was willing to serve. However, the judge asked her to take a seat in the body of the courtroom and stated:

> I don't mind telling you, ladies and gentlemen of the jury or the panel of the grand jury, I am trying to get a cross-section; and as you've probably noticed, I have asked two of the blacks who have indicated a willingness to serve to sit in the body of the courtroom. I am deliberately trying to get an even mix of people from background and races, and things like that. And if any of you think that I am in any way being sneaky about it, please understand that I am not. I am telling you like it is, and that is the reason I have done what I have done.

App. at 2449–2450.[2] Following this announcement, the judge asked two other panel members who expressed a willingness to serve, Francena Hardwick, app. at 2453, and Orro Ikena, app. at 2454, to sit in the body of the courtroom.

After panel members one through twenty-two had been selected, but prior to voir dire, the assignment judge asked Ms. Cata-

---

**2.** The record does not clearly indicate which panel members the judge was referring to nor does it establish that only two rather than all three of the panel members asked to sit aside up to that point were black.

gen to come up from the body of the court-room and take seat number twenty-three. The judge then embarked on voir dire of the jurors assembled. One of the jurors explained that she was "prejudiced against certain people, certain races." The judge excused that juror, explaining, "I appreciate your honesty, and we don't want people like you to serve on the Grand Jury." App. at 2464. That juror was replaced by Orro Ikena. At that point Mr. Ikena proffered an excuse which the court accepted. Ms. Patrick was then asked to take the seat to which Mr. Ikena had been assigned. Ultimately, George Smith, the fifth juror who had expressed a willingness to serve but was initially asked to sit in the body of the courtroom, also found his way onto the panel although the transcript does not reflect how this came about. Ms. Hardwick, who had expressed a willingness to serve but was nonetheless asked to sit in the body of the courtroom, was never chosen as a grand juror. The record does not clearly establish the race of Mr. Ikena, Mr. Smith, or Ms. Hardwick.

N.J.S.A. 2A:73–1 provides:

If from any grand jury panel, more persons remain available for service, after excuses have been allowed, than are necessary to constitute the grand jury, the persons whose names are first drawn and not excused, not to exceed twenty-three in number, shall constitute the grand jury.

The random selection procedure set forth in the New Jersey statute was routinely ignored by the assignment judges of Essex County at the time Ramseur's grand jury was chosen.[3] At a hearing regarding Ramseur's allegations in 1983, one assignment judge stated that rather than selecting jurors randomly "it may be on the basis of my observation of them that I feel that they should not be selected." App. at 3883–3884. Asked if his choices were made as a result of his "discretionary judgment about each person," the judge responded, "There is no question about that." *Id.* The record in this case contains many similar statements that show that Essex County assignment judges used subjective criteria to select grand jurors and often considered race, "a racial balance" or a "cross section" of black and white jurors when assembling grand juries.[4]

---

3. We are advised that the procedures used by the assignment judges in Essex County at the time of Ramseur's indictment are no longer in effect.

4. For example, the questions to the judge continued:

Q. And what are your standards for these judgments?

A. It depends upon the person I am selecting Mr. Kairys. I do not mean to be evasive, but I guess on the sum total of my life's experiences, sir, keeping in mind that I have been a resident of Essex County all of my life, until recently, that I believe I know what Essex County is all about and trying to gain a cross-section of Essex County on the basis of the potential panel that is before me. I will look at the questionnaires, look at the letters, listen to what they say, how they say it, how they look and determine whether or not I think they will be a responsible Grand Juror and, most of all, be fair and impartial.

\* \* \* \* \* \*

Q. Say the next person in the line is Tom Jones and Tom Jones stands up and he has a factory job and he is 25 years old. Do you look for his race?

A. Of course, that is one of the things I do look for because that is one of the things that

forms a cross-section or at least my conception of a cross-section of Essex County.

Q. Let's say he is black.

A. Yes.

Q. How are we going to figure out whether he is going to follow the law or not?

A. It is a judgment call, Mr. Kairys. I cannot tell you whether indeed a particular juror is going to ignore their responsibility under the law. . . .

\* \* \* \* \* \*

Q. You read the statute as mandating that you should use your own discretion and make a judgment on each juror and not just pick the first 23.

A. Absolutely. That is what the word "excuse" means. I can excuse a juror because they have an obvious prejudice. I can excuse a juror because they are not qualified. I can excuse a juror—

Q. How about undesirable?

A. Absolutely, undesirable. . . .

\* \* \* \* \* \*

Q. Now, you said that you also look for a cross-section. What is a cross-section? And what does a cross-section consist of?

A. My concept of Essex County is that Essex County is made up of black, white, Hispanic, Oriental men and women, people who have different vocations or not vocation, people who

■■ Based upon the protections of the Equal Protection Clause of the Fourteenth Amendment, the United States Supreme Court "gradually has abolished race as a consideration for jury service." *Georgia v. McCollum,* —— U.S. ——, ——, 112 S.Ct. 2348, 2352, 120 L.Ed.2d 33 (1992). "[R]acial discrimination in the qualification or selection of jurors offends the dignity of persons and the integrity of the courts." *Powers v. Ohio,* —— U.S. ——, ——, 111 S.Ct. 1364, 1366, 113 L.Ed.2d 411 (1991). Discrimination on the basis of race in the selection of grand jurors is unacceptable and " 'strikes at the fundamental values of our judicial system and our society as a whole.' " *Vasquez v. Hillery,* 474 U.S. 254, 262, 106 S.Ct. 617, 622, 88 L.Ed.2d 598 (1986) (quoting *Rose v. Mitchell,* 443 U.S. 545, 556, 99 S.Ct. 2993, 3000, 61 L.Ed.2d 739 (1979)).

■ Discrimination in the jury selection process harms the defendant, prospective and actual jurors, and the community as a whole. The defendant has an "interest in neutral jury selection procedures ... because racial discrimination in the selection of jurors casts doubt on the integrity of the judicial process, and places the fairness of a criminal proceeding in doubt." *Powers,* —— U.S. at ——, 111 S.Ct. at 1371. Jurors have the right to be unmarred by public discrimination in the justice system.

have advocation [sic] retired, executives, assembly line workers, people who perform ministerial tasks on a day-to-day basis, housewives, mothers. I could go on and on I guess.

Q. A great variety is the point you're making.

A. Yes; that is what I try to accomplish in selecting a grand jury, great variety.

Q. And does cross-section to you have any notion of proportion?

A. Well, I have never conducted studies nor have I kept in mind any census which would suggest a proportionality. The reason I do not do that is, one, I do not think I could accomplish that even if I had it in my mind and, secondly, I am initially circumscribed then by the random process which brings before me the 50 or 60 jurors that form the potential panel.

\* \* \* \* \* \*

Q. Are there usually too few blacks available, sir, in your estimation?

A. No, I cannot say that.

Q. Could it go either way?

A. Yes, absolutely.

Q. And are there situations where you then have picked people of one race or another over people of the opposite race to get a balance?

A. Yes—

Q. Even though both would be qualified?

A. Both would meet the qualifications, yes. I have publicly announced that to them, sir, that I will pass people. If I have too many males, I will pass them. If I have too many females, I will pass them. If I have too many blacks, I will pass them. Yesterday's Grand Jury selection process, sir, I had an inordinate number of black females at the beginning of the process. It worked out, in my judgment, but that is what I was faced with at the initial selection process. App. at 3882–3901.

At this same hearing in 1983, the other Essex County assignment judge testified to using a similar selection "procedure," stating that he would "try to get a balance between males and females and Caucasians and non-Caucasians."

App. at 3827. The questioning of the second judge continued as follows:

Q: How about as to race, what was the balance you sought there?

A: I tried to do that about the same, if I could.

Q: 50/50?

A: I tried to do it.

Q: You tried to get half black and half white.

A: I did not consciously say half. I tried to get a good balance between black and white, bearing in mind that the black population of the county is somewhere around 40 percent, as I recall it, and the balance was white.

Q: I see. But you did not then, just so the record is clear, you did not start from, say, the top and take the first name and take every name thereafter that is not excused.

A: Not necessarily. Sometimes I did and sometimes I did not.

\* \* \* \* \* \*

Q: How did you know the race as you went through the list?

A: I insisted that the jurors be present in the courtroom rather than excuse them solely by administrative activity, although some were if they were obviously so ill that they could not be here. I would ask for excuses and as each name was called I would make an observation. If that person was black, then I would put a little note on my major chart, B for black; if he or she was white, then I would leave it unmarked, sir, so I would know in my final selection as to whether or not the person was black or white.

Q: And your goal is to get 50 percent black.

A: My goal was to try to make a generally even balance between the races based upon the percentage as I understood was the population division in the County of Essex.

\* \* \* \* \* \*

Q: I understand. The procedure then of noting the race and thinking about balance was something that you did every time, though.

In *Edmonson v. Leesville Concrete Co.*, — U.S. —, —, 111 S.Ct. 2077, 2087, 114 L.Ed.2d 660 (1991), the Court explained that the harm of discriminatory peremptory challenges includes the danger that "persons could be required by summons to be put at risk of open and public discrimination as a condition of their participation in the justice system." Discrimination in the jury selection process undermines the justice system, and, thereby, the whole of our society.

> [T]he injury caused by the discrimination [in the jury selection process] is made more severe because the government permits it to occur within the courthouse itself. Few places are a more real expression of the constitutional authority of the government than a courtroom, where the law itself unfolds. Within the courtroom, the government invokes its laws to determine the rights of those who stand before it. In full view of the public, litigants press their cases, witnesses give testimony, juries render verdicts, and judges act with the utmost care to ensure that justice is done.
>
> Race discrimination within the courtroom raises serious questions as to the fairness of the proceedings conducted there. Racial bias mars the integrity of the judicial system and prevents the idea of democratic government from becoming a reality.

*Edmonson*, — U.S. at —, 111 S.Ct. at 2077.

■■■ The Court has ruled that a determination of racial discrimination in the selection of grand jurors will support the quashing of a resulting indictment and reversal of the conviction.[5]

> Intentional discrimination in the selection of grand jurors is a grave constitutional trespass, possible only under color of state authority, and wholly within the power of the state to prevent. Thus, the remedy we have embraced for over a century—the only effective remedy for this violation—is not disproportionate to the evil that it seeks to deter. If grand jury discrimination becomes a thing of the past, no conviction will ever again be lost on account of it.

*Vasquez*, 474 U.S. at 262, 106 S.Ct. at 623.[6]

■■ In order to establish an equal protection violation, a party must show that

---

A: Absolutely.

App. at 3828–3831.

**5.** In the context of a habeas challenge to grand jury selection procedures, the appropriate relief for a successful petitioner is to "reverse[] the conviction and order[] the indictment quashed," requiring the state to reindict and retry the petitioner or release him from confinement. *See Rose*, 443 U.S. at 556, 99 S.Ct. at 3000. This remedy has been supported by two considerations. First, the Court has concluded that discrimination in the grand jury selection process cannot be divorced from the trial proceeding itself. In *Vasquez*, 474 U.S. at 263, 106 S.Ct. at 623, the Court explained:

> Nor are we persuaded that discrimination in the grand jury has no effect on the fairness of the criminal trials that result from that grand jury's actions.... [E]ven if a grand jury's determination of probable cause is confirmed in hindsight by a conviction on the indicted offense, that confirmation in no way suggests that the discrimination did not impermissibly infect the framing of the indictment and, consequently, the nature or very existence of the proceedings to come.

Second, the Court has concluded that reversing convictions obtained after tainted grand jury proceedings has an "educative and deterrent effect" that will require state officials to "take note of a federal court's determination that their procedures are unconstitutional and must be changed." *Rose*, 443 U.S. at 563, 99 S.Ct. at 3004. "The overriding imperative to eliminate this systemic flaw [of discrimination in grand jury selection], as well as the difficulty of assessing its effect on any given defendant, requires our continued adherence to a rule of mandatory reversal." *Vasquez*, 474 U.S. at 264, 106 S.Ct. at 624.

**6.** It should be noted that harmless error analysis is inappropriate in cases involving discrimination in the jury selection process. "[T]he Court ... has reversed the conviction and ordered the indictment quashed in such cases without inquiry into whether the defendant was prejudiced in fact by the discrimination at the grand jury stage." *Rose*, 443 U.S. at 556, 99 S.Ct. at 3000. The plurality opinion in *Vasquez* explicitly stated that "discrimination in the grand jury undermines the structural integrity of the criminal tribunal itself, and is not amenable to harmless-error review." *Vasquez*, 474 U.S. at 263–64, 106 S.Ct. at 623. Moreover, all nine justices joined opinions in *Arizona v. Fulminante*, — U.S. —, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), which explained in dicta that harmless error analysis does not apply in the context of discrimination

there has been some actual "purposeful discrimination" in the jury selection process. *See Batson v. Kentucky*, 476 U.S. 79, 96, 106 S.Ct. 1712, 1722, 90 L.Ed.2d 69 (1986). The crucial question at issue in the present case is whether such purposeful discrimination has been demonstrated. In *Batson*, which involved the discriminatory use of peremptory challenges by the prosecution in choosing a petit jury, the Court held that "a single invidiously discriminatory governmental act" is sufficient to constitute a constitutional violation. *See id.* at 95–96, 106 S.Ct. at 1722. In *Batson* this meant that, rather than having to show a systematic race-based exclusion of petit jurors through the use of peremptory challenges, a criminal defendant could show that in his case alone the prosecutor exercised peremptory challenges to exclude members of the defendant's race from the jury. *See id.*

"The basic principles prohibiting exclusion of persons from participation in jury service on account of their race 'are essentially the same for grand juries and for petit juries.'" *Id.* at 84 n. 3, 106 S.Ct. at 1716 n. 3 (quoting *Alexander v. Louisiana*, 405 U.S. 625, 626 n. 3, 92 S.Ct. 1221, 1223 n. 3, 31 L.Ed.2d 536 (1972)). Therefore, the analog to *Batson* in the context of grand jury selection is that, to establish a Fourteenth Amendment violation, a defendant must demonstrate purposeful discrimination in the selection of the grand jury panel that indicted him.

The present case, however, presents a rather unusual factual situation. Here, it cannot be said that any prospective grand jurors were actually *excluded* from grand jury service on the basis of their race. The record indicates that two African–American prospective grand jurors were asked to sit in the body of the courtroom, for possible later selection, because they were African–American. These two prospective jurors were eventually empaneled. While an additional prospective grand juror was asked to sit in the body of the courtroom and was not subsequently empaneled, it is impossible to discern from the record either her race or whether she was initially passed over because of her race of because of some other factor such as her "background." Therefore, this case presents the difficult question of whether purposeful discrimination may be shown absent proof of the actual exclusion from jury service of someone on the basis of her race.

■ Under the rationale articulated in *Batson* and its progeny,[7] it is necessary to establish three elements to raise an inference of discrimination in the context of grand jury selection. First, the prospective juror allegedly discriminated against must be a member of a cognizable racial group. *See Batson*, 476 U.S. at 96, 106 S.Ct. at 1722 (prohibiting use of peremptory challenges to strike members of defendant's racial group); *Powers*, —— U.S. at ——, 111 S.Ct. at 1368 (extending *Batson* to prohibit use of peremptory challenges to strike jurors on the basis of their race regardless of whether their race is the same as the defendant's race). Second, there must be "a

---

in the jury selection process. *See id.* at ——— ———, 111 S.Ct. at 1256–57 (such discrimination is "not amenable to harmless error review"); *id.* at ———, 111 S.Ct. at 1265 ("Since our decision in *Chapman*, other cases have added to the category of constitutional errors which are not subject to harmless error the following: unlawful exclusion of members of the defendant's race from a grand jury, *Vasquez v. Hillery*...."); *see also Bank of Nova Scotia v. United States*, 487 U.S. 250, 257, 108 S.Ct. 2369, 2374, 101 L.Ed.2d 228 (1988) (*Vasquez* and *Rose* represent cases where "racial discrimination in selection of grand jurors compelled dismissal of the indictment" because "other remedies were impractical and it could be presumed that a discriminatorily selected grand jury would treat defendants unfairly").

7. In citing *Batson*, we are equally invoking the prior authority of cases such as *Neal v. Delaware*, 103 U.S. 370, 26 L.Ed. 567 (1880), holding that "a denial ... of [defendant's] right to a selection of grand and petit jurors without discrimination against his race because of their race, would be a violation of the Constitution...." *Id.* at 394. *Neal* deals with expressly deliberate systemic discrimination. In the present case, we have express racial references, but we do not have an express racial exclusion, as in *Neal*. For this reason, we have analyzed the court's actions by employing tests formulated in more recent cases, dealing with examples of less blatant discrimination than was found in *Neal*. Had there been an actual exclusion here on the basis of race, however, we would consider *Neal* as relevant precedent rather than *Batson*.

jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723 (quoting *Avery v. Georgia*, 345 U.S. 559, 562, 73 S.Ct. 891, 891, 97 L.Ed. 1244 (1953)). Finally, the defendant must show that the "opportunity for discrimination" was utilized. *See Batson*, 476 U.S. at 96–97, 106 S.Ct. at 1723 (in peremptory challenge context, the "defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race"); *Whitus v. Georgia*, 385 U.S. 545, 552, 87 S.Ct. 643, 647, 17 L.Ed.2d 599 (1967) (discrimination in the selection of a jury venire found when names of prospective black and white jurors were separated on the list used to select jurors and there existed a substantial disparity between the percentage of blacks in the population and that in the jury venire).

In the present case, the first criterion is clearly met. The assignment judge's statement, after three jurors were passed over for service, that he had asked two African–Americans to sit in the body of the courtroom in his effort to create a cross section of the community on the grand jury panel demonstrates that two prospective jurors, treated in this manner, were members of a cognizable racial group. Moreover, the second criterion is met. The practices employed by the assignment judges in the Essex County grand jury selection processes provided an opportunity for discrimination. As documented by the assignment judge's statements during the grand jury selection at issue and by his later testimony, the practice permitted the judge subjectively to include or exclude jurors and provided the opportunity for discrimination based upon race. *Cf. Vasquez*, 474 U.S. at 256, 106 S.Ct. at 619 (subjective judicial selection of grand jurors provided an opportunity for discrimination); *Cassell v. Texas*, 339 U.S. 282, 287, 70 S.Ct. 629, 631, 94 L.Ed. 839 (1950) (jury commissioners' subjective selection of jury venire provided an opportunity for discrimination); *Smith v. Yeager*, 465 F.2d 272, 280 (3d Cir.1972)

(same); *see also United States v. Calabrese*, 942 F.2d 218, 227 (3d Cir.1991) (procedures which allowed courts subjectively to add categories for juror exclusion to the Jury Selection and Service Act of 1988 provided an opportunity for discrimination).

■ The real problem here is whether that opportunity for discrimination was utilized absent the actual exclusion of a juror from the panel on the basis of race. The previous case law dealing with discrimination in the context of jury selection involves *exclusion* on account of race. *See, e.g., McCollum*, —— U.S. at ——, 112 S.Ct. at 2352 (defendant's use of peremptory challenges to exclude African–Americans); *Batson*, 476 U.S. at 83, 106 S.Ct. at 1715 (prosecutor's use of peremptory challenges to exclude blacks); *Vasquez*, 474 U.S. at 256, 106 S.Ct. at 619 (grand jury assignment judge's exclusion of blacks from grand jury service); *Castaneda v. Partida*, 430 U.S. 482, 493–94, 97 S.Ct. 1272, 1279–80, 51 L.Ed.2d 498 (1977) (jury list's substantial underrepresentation of Mexican–Americans); *Cassell*, 339 U.S. at 286–87, 70 S.Ct. at 631–32 (jury commissioners' proportional limitation of blacks on grand jury).

■ Moreover, an analytical focus of discriminatory jury selection claims is upon the opportunity of our citizens to deliberate as jurors. As the Supreme Court has recently stated in *Powers*:

The opportunity for ordinary citizens to participate in the administration of justice has long been recognized as one of the principal justifications for retaining the jury system..... Jury service preserves the democratic element of the law, as it guards the rights of the parties and insures continued acceptance of the laws by all of the people.... Indeed, with the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process.

*Powers*, —— U.S. at ——, 111 S.Ct. at 1368–69.

■ The Court has also recently emphasized that, in general, discrimination in

the grand jury selection process could "impermissibly infect" court proceedings to the detriment of the defendant, prospective and actual jurors, and the community. *See Vasquez*, 474 U.S. at 263, 106 S.Ct. at 623 (infection of proceedings could deny the defendant a fair trial); *see also Edmonson*, —— U.S. at ——, 111 S.Ct. at 2087 (noting the "risk of open and public discrimination as a condition of [jurors'] participation in the justice system"); *Powers*, —— U.S. at ——, 111 S.Ct. at 1373 ("race neutrality in jury selection [is] a visible, and inevitable, measure of the judicial system's own commitment to the commands of the Constitution").[8]

■ Viewing the facts of the present case in the light of precedent, we conclude that the statements and actions of the assignment judge in the present case did not impermissibly infect the proceedings at issue and do not comprise an equal protection violation. First, there was no actual exclusion of a prospective juror on account of her race. The two jurors who were initially passed over based upon their race were eventually empaneled. Moreover, we are not willing to accept appellant's invitation to speculate, absent supporting evidence in the record, that Francena Hardwick, who was passed over and not seated, was both African–American and passed over on account of her race.[9] Therefore, no prospective juror's opportunity to deliberate was impermissibly denied for a tainted reason.

Second, we do not believe that the assignment judge's statements and actions short of actual exclusion comprised an equal protection violation. The assignment judge mentioned that he employed race as a factor in his effort to "pick a cross section of the community" and "get an even mix of people from background and races, and things like that." App. at 2429, 2449. He also temporarily asked two African–American prospective jurors to sit in the body of the courtroom until they were belatedly empaneled. While we find objectionable this subjective sorting of the jury members and the judge's statements about balancing the jury according to race, we cannot conclude that these activities violated the Equal Protection Clause. While subjectively rigging the jury to represent his vision of the appropriate representation of Essex County's population was ill-conceived, it apparently was not motivated by a desire to discriminate purposefully against African–Americans, nor was it apparently an attempt expressly to limit the number of African–Americans who could serve on an Essex County grand jury.

■ These factors distinguish the present case from *Cassell*, 339 U.S. at 288–89, 70 S.Ct. at 632–33. *Cassell* involved jury commissioners' limitation of African–Americans on grand jury panels to one African–American per panel. The jury commission-

8. Because the infected jury selection proceeding impairs the rights of criminal defendants, jurors, and the public, the Supreme Court has stated that criminal defendants have standing, as first or third parties, to challenge such infected proceedings. *See McCollum*, —— U.S. at ——, 112 S.Ct. at 2353–55, 2357. It is important to heed the Court's recognition that an infected jury selection proceeding undermines the integrity of the jury system and lays the groundwork for the denial of future criminal defendants' constitutional guarantees. "The jury acts as a vital check against the wrongful exercise of power by the State.... The intrusion of racial discrimination into the jury selection process damages both the fact and the perception of this guarantee. Jury selection is the primary means by which a court may enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice." *Powers*, —— U.S. at ——, 111 S.Ct. at 1364 (citations omitted); *see*

*also McCollum*, —— U.S. at ——, 112 S.Ct. at 2354 ("[I]f a court allows jurors to be excluded because of group bias, it is a willing participant in a scheme that could only undermine the very foundation of our system of justice—our citizens confidence in it"). We disagree with Judge Alito's analysis of third party standing, *see infra* at 1244–46, because it underemphasizes the community's interest in the jury selection process.

9. The dissent argues that this case should be remanded to the district court in order to determine Ms. Hardwick's race. *See infra* at 1248 n. 2. Such a remand would be improper. Ms. Hardwick's race cannot be determined from the record in this case which has been developed for over nine years. We conclude that Ramseur has failed to meet his burden of proof with regard to Ms. Hardwick's race.

ers expressed both their belief in the legitimacy of proportionally limiting the number of African–Americans on grand jury panels to their representation in the general population and their opinions that they did not know any African–Americans who were qualified to serve as grand jurors. *See id.* The Court inferred, based upon such statements, that the jury commissioners had purposefully discriminated against African–Americans and engaged in "proportional limitation" of African–Americans on grand jury panels. *See id.* at 287, 70 S.Ct. at 631. Here, the assignment judges' statements demonstrate no such desire proportionally to limit the number of blacks to some cutoff figure, nor do they indicate the presence of purposeful manifestations of invidious discrimination. The judge in the present case apparently wished the non-invidious objective of a representative jury. We are reluctant to infer an invidious discriminatory purpose when the record does not support such an inference. *See, e.g., United States v. Bedonie,* 913 F.2d 782, 795 (10th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 2895, 115 L.Ed.2d 1059 (1991) (refusing to infer that use of peremptory strike of Native American prospective juror was racially motivated).

▮ Moreover, the judge who empaneled Ramseur's grand jury explicitly rebuked the legitimacy of racial discrimination in grand jury proceedings. When a juror had expressed that she was prejudiced against "certain people, certain races," the judge, in excusing her, stated, "I appreciate your honesty, we don't want people like you to serve on the Grand Jury and I will be just as honest with you." *See* App. at 2464. To the extent that prospective jurors and the public might have inter-preted the assignment judge's jury sorting as purposeful discrimination, this rebuke of juror prejudice would countermand such an interpretation.[10] Unlike *Batson* and its peremptory challenge progeny, the present case involves no instances of the imprimatur of the state being given to discriminatory actions, such as exclusions. Rather, the present case involves statements and conduct, which although objectionable, simply do not warrant an inference of "purposeful" discrimination. Indubitably, we seek to eradicate discrimination from the grand jury selection process. However, the record here does not justify our finding either an invidious purpose to discriminate or a communication to the public by the assignment judge that the state countenanced racial prejudice.[11]

### III.

We will next address Ramseur's challenge to the juror source lists used in Essex County. Ramseur contends that, because it underrepresents the African–American community in Essex County, the composition of the juror source list and resulting qualified pool of jurors violates his Fourteenth Amendment right to Equal Protection of the laws and his Sixth Amendment right to a grand and petit jury drawn from a cross-section of his community.[12] We will first set forth the factual basis for his claim and then explore the legal framework within which these facts must be examined.

Since 1979, grand and petit juries in Essex County have been chosen from a source list consisting of the names found on the Department of Motor Vehicles licensed driver list and the voter registration list. From this source list, which is ar-

---

**10.** We are in no way engaging in a "harmless error" analysis. *See* discussion *supra* note 6. Rather, we have examined the judge's action of excusing a racially biased prospective juror in the process of determining what message is conveyed to the public by the totality of the judge's conduct. We find that the message sent to the public is one of disapproval, not acceptance, of invidious racial discrimination.

**11.** This does not mean that there are no circumstances under which conduct short of actual exclusion would constitute an equal protection violation. We merely hold that the conduct in the present case was insufficient impermissibly to "infect" the proceedings such that an equal protection violation occurred.

**12.** Ramseur also contends that women, low income groups, young people, students and Newark residents were underrepresented. However, he rests his argument on the underrepresentation of blacks and thus we examine his claim on that basis.

ranged by municipality, there is derived a "master" list consisting of the names of all people to whom qualifying questionnaires may be sent. Jury managers decide the number of questionnaires to be sent based on the anticipated need for jurors and past experience regarding the rate of return expected from the questionnaire mailing. The appropriate number of questionnaires are then sent to people selected randomly from the source list. This method is designed to ensure that prospective jurors are selected from each street in each municipality without choosing more than one person from any one household.

Twenty to twenty-eight percent of the questionnaires sent are completed and returned. Those questionnaires are then screened for eligibility. Those who have served on a jury within the past seven years or who have received a questionnaire within the past four years are not eligible. If the response to the questionnaire indicates extreme hardship, the potential juror is excused. The remaining names are placed on the "qualified" list. Once the qualified list is completed, jury managers make a random selection of grand jurors from it. Those who are not chosen as grand jurors are designated as petit jurors. The resulting lists are divided into panels and summonses are sent to the jurors on the panels, ordering them to report for jury duty.

The 1980 census figures indicated that African–American adults in Essex County comprised 35.9 percent of the population of those between the ages of eighteen and seventy-four. Defense experts in this case conducted three separate surveys between 1981 and 1982 in order to determine the percentage of African–Americans on the jury lists. Two were telephone surveys— one conducted in May 1981, the other in May 1982. The third was a geographic inference survey, a study in which the race of each juror is inferred from census information regarding the racial makeup of the area of Essex County in which the juror lives. *See Ramseur,* 106 N.J. at 214 n. 41; 524 A.2d at 233 n. 41. By averaging the results of the telephone surveys and the geographic inference study, defense experts concluded that only 21.2% of the persons on the source list and 21.8% of those on the qualified list were African–American.

The Equal Protection Clause of the Fourteenth Amendment requires the eradication of "racial discrimination in the procedures used to select the venire from which individual jurors are drawn." *Batson v. Kentucky,* 476 U.S. 79, 86, 106 S.Ct. 1712, 1717, 90 L.Ed.2d 69 (1986). The Sixth Amendment requires that jurors be drawn from pools that represent a "fair cross-section" of the community. "[J]ury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Duren v. Missouri,* 439 U.S. 357, 363–64, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979) (quoting *Taylor v. Louisiana,* 419 U.S. 522, 538, 95 S.Ct. 692, 701, 42 L.Ed.2d 690 (1975)).

The requirements a party must meet when challenging the jury selection process as being racially discriminatory are comparable under equal protection and fair cross-section analysis. To prove either claim, a defendant must first identify a constitutionally cognizable group, that is, a group capable of being singled out for discriminatory treatment. *See Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977); *Duren,* 439 U.S. at 364, 99 S.Ct. at 668. Ramseur has clearly met the first prong of both the equal protection and fair cross-section tests because African–Americans are unquestionably a constitutionally cognizable group. *See, e.g., Batson,* 476 U.S. at 84, 106 S.Ct. at 1716; *Rose v. Mitchell,* 443 U.S. 545, 551, 99 S.Ct. 2993, 2997, 61 L.Ed.2d 739 (1979).

Second, to prove an equal protection violation, the defendant must show that the cognizable group was subject to "substantial underrepresentation" over a significant period of time. *See Castaneda,* 430 U.S. at 494, 97 S.Ct. at 1280. The second requirement in a Sixth Amendment challenge may differ somewhat in applica-

tion: the defendant must show that the representation of the cognizable group was not "fair and reasonable in relation to the number of such persons in the community." *Duren*, 439 U.S. at 364, 99 S.Ct. at 668.

■ Finally, to prove an equal protection violation, the defendant must show that the procedure which is being used to select the jurors is "susceptible of abuse or is not racially neutral." *Castaneda*, 430 U.S. at 494, 97 S.Ct. at 1280. To succeed in a Sixth Amendment challenge, the defendant need show only that the underrepresentation was a result of systematic exclusion of the group in the jury selection process. *See Duren*, 439 U.S. at 364, 99 S.Ct. at 668.

■ The imbalance necessary to establish an equal protection or Sixth Amendment violation in the composition of a jury venire is not determined by a bright line test. The Supreme Court "has never announced mathematical standards" that would apply to all such challenges. The Court has, however, recognized that it may be possible to infer that unconstitutional exclusion of cognizable groups exists when there is a disparity between a group's population figures and its representation in the jury venire sufficiently large that it is extremely unlikely that the disparity results from random chance. *See Castaneda*, 430 U.S. at 496 & n. 17, 97 S.Ct. at 1281 & n. 17; *Alexander v. Louisiana*, 405 U.S. 625, 630 & n. 9, 92 S.Ct. 1221, 1225 & n. 9, 31 L.Ed.2d 536 (1972). Such an inference may be bolstered or weakened by a direct examination of the reasons for any seemingly

non-random disparity that exists. *See Alexander*, 405 U.S. at 630, 92 S.Ct. at 1225.

■ In the present case, we find the New Jersey Supreme Court's analysis of Ramseur's challenges to the composition of his jury venire carefully reasoned and persuasively explained. *See Ramseur*, 106 N.J. at 212–28, 524 A.2d at 232–40. It is both logical and consistent with the United States Supreme Court's requirements that these challenges be evaluated, first, by determining whether there is a non-random disparity between the percentage of African–Americans who live in Essex County and the percentage of African–Americans on Essex County jury lists, and second, if there is an imbalance, by addressing the reasons for it.[13]

■ In proceeding to determine whether a non-random disparity existed, we examine evidence of absolute disparity, comparative disparity, and deviation from expected random selection.[14] The results of Ramseur's studies reflected an absolute disparity of 14.1% for the qualified list and an absolute disparity of 14.6% for the source list. Absolute disparity in the jury selection context is defined as the difference between the percentage of a certain population group eligible for jury duty and the percentage of that group who actually appear in the venire.[15] The results reflected a comparative disparity of 39.3% for the qualified list and 40.1% for the source list. Comparative disparity is calculated by dividing the absolute disparity by the population figure for a population group. It measures the diminished likelihood that members of an underrepresented group,

---

**13.** This analysis requires examining evidence that could be pigeonholed to either the second prong "substantial underrepresentation" analysis of *Castaneda*, or the third prong "susceptible of abuse or is not racially neutral" prong of *Castaneda*. To the extent that each prong can be characterized as an independent inquiry, examination of evidence that could satisfy both prongs need not fully collapse those inquiries. Moreover, it is logical to view the presence of a non-random disparity as establishing an "underrepresentation," while the disparity's severity, longevity, underlying causes, and documentation would establish whether it was "substantial."

**14.** *See, e.g., Swain v. Alabama*, 380 U.S. 202, 208–09, 85 S.Ct. 824, 829–30, 13 L.Ed.2d 759 (1965) (absolute disparity); *Alexander*, 405 U.S. at 629–30, 92 S.Ct. at 1224–25 (mentioning comparative disparity figures); *Castaneda*, 430 U.S. at 496 n. 17, 97 S.Ct. at 1281 n. 17 (standard deviation analysis).

**15.** *See* National Jury Project, *Jurywork: Systematic Techniques*, § 5.05[2][c][i], [ii], and [iv] (1983) (absolute disparity is achieved by subtracting percentage of group which appears on list from percentage of that group in population).

when compared to the population as a whole, will be called for jury service.[16] Finally, according to the defendant's unchallenged statistical analysis, a standard deviation analysis revealed that there was an observed deviation of 28.9 "standard deviations" from the expected deviation. This analysis explains the probability that the disparity between the percentages of African–Americans in the population of Essex County and African–Americans in the qualified pool and source list is a result of random chance. A deviation of 28.9 standard deviations means that the probability that the disparity at issue is the result of random chance is less than 1 in 10140. *See Castaneda v. Partida,* 430 U.S. 482, 496 & n. 17, 97 S.Ct. 1272, 1281 & n. 17, 51 L.Ed.2d 498 (1977).[17]

▌ If we compare the 14.1% absolute disparity in the Essex County juror source list with the results in other cases, we find the 14.1% to be of borderline significance. Courts addressing the question of whether a given absolute disparity constitutes "substantial underrepresentation" have held that absolute disparities between 2.0% and 11.5% do not constitute substantial underrepresentation.[18] However, some courts have found disparities of between 10% and 16% sufficient to establish "substantial underrepresentation." *See Jones v. Georgia,*

389 U.S. 24, 25, 88 S.Ct. 4, 5, 19 L.Ed.2d 25 (1967) (15.7%); *Hernandez v. Texas,* 347 U.S. 475, 480–81, 74 S.Ct. 667, 671–72, 98 L.Ed. 866 (1954) (14.0%); *Stephens v. Cox,* 449 F.2d 657, 659–60 (4th Cir.1971) (15.0%).

Ramseur's evidence of a comparative disparity of about 40% is also borderline. It is a bit lower than the 45.4% condemned in *Preston v. Mandville,* 428 F.2d 1392 (5th Cir.1970) and close to the 42% comparative disparity found permissible in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). Thus, both the absolute and comparative disparity analyses present results at the margin of the range found acceptable by the courts.

Perhaps more importantly, however, the standard deviation analysis revealed 28.9 standard deviations, a departure from the expected value which would occur by random chance in less than 1 in $10^{140}$ occasions. This figure is virtually identical to the 29 standard deviations condemned in *Castaneda,* 430 U.S. at 496 & n. 17, 97 S.Ct. at 1281 & n. 17. We, like the New Jersey Supreme Court, find that this standard deviation analysis reveals that the underrepresentation of blacks in the Essex County jury pools is not the result of random selection.

---

16. *See* David Kairys, Joseph B. Kadane & John P. Lehoczky, *Jury Representativeness: A Mandate for Multiple Source Lists,* 65 Cal.L.Rev. 776, 790–91 (1977).

17. A standard deviation analysis would proceed as follows: Creating a jury list would be similar hypothetically to stocking a shelf with 100 pens randomly selected from a batch of 1000 pens, 700 of which are blue and 300 of which are red. The expected number of blue pens would be 700 × .1 or 70 pens and the expected number of red pens would be 300 × .1 or 30 pens. However, there is a certain probability that random selection would yield a different result. The standard deviation calculation measures how likely it is that a deviant result occurred by chance. In the above example, the standard deviation is the square root of the product of the number of pens shelved (100) times the probability of drawing a red pen (0.3) times the probability of drawing a blue pen (0.7). Here, that number is 4.6 pens. Each standard deviation results in a substantially reduced probability that the result occurred by random chance. In our example, the probability that 20 red pens and 80 blue

pens would be randomly shelved is less than 5 percent. *See Castaneda,* 430 U.S. at 496 n. 17, 97 S.Ct. at 1281 n. 17.

18. *See United States v. Hafen,* 726 F.2d 21, 23 (1st Cir.), *cert. denied,* 466 U.S. 962, 104 S.Ct. 2179, 80 L.Ed.2d 561 (1984) (2.02%); *Bryant v. Wainwright,* 686 F.2d 1373, 1377–78 (11th Cir. 1982), *cert. denied,* 461 U.S. 932, 103 S.Ct. 2096, 77 L.Ed.2d 305 (1983) (7.4%); *United States v. Hawkins,* 661 F.2d 436, 442 (5th Cir.1981), *cert. denied,* 456 U.S. 991, 102 S.Ct. 2274, 73 L.Ed.2d 1287 (1982) (5.45%); *United States v. Clifford,* 640 F.2d 150, 155 (8th Cir.1981) (7.2%); *United States ex rel. Barksdale v. Blackburn,* 639 F.2d 1115, 1126–27 (5th Cir.1981), *cert. denied,* 454 U.S. 1056, 102 S.Ct. 603, 70 L.Ed.2d 593 (1981) (11.5%); *United States v. Potter,* 552 F.2d 901, 906 (9th Cir.1977) (2.7%); *Thompson v. Sheppard,* 490 F.2d 830, 832–33 (5th Cir.1974), *cert. denied,* 420 U.S. 984, 95 S.Ct. 1415, 43 L.Ed.2d 666 (1975) (11.0%); *United States v. Musto,* 540 F.Supp. 346, 356 (D.N.J.1982), *aff'd sub nom., United States v. Aimone,* 715 F.2d 822 (3d Cir. 1983), *cert. denied,* 468 U.S. 1217, 104 S.Ct. 3585, 82 L.Ed.2d 883 (1984) (5.4%).

■ However, the presence of non-random underrepresentation does not necessarily mean that purposeful discrimination has occurred; rather, any implication of discrimination that exists must be evaluated in light of the circumstances surrounding the present case. Particularly significant to our analysis are the time period covered by Mr. Ramseur's evidence of underrepresentation and the nature of the source lists and the procedures by which they are compiled.

■ The evidence which is relied upon to document the underrepresentation of a minority group on jury lists must be carefully scrutinized. *See Castaneda*, 430 U.S. at 494, 97 S.Ct. at 1280 (requiring evidence that demonstrates underrepresentation "over a significant period of time"). As one court has stated:

A disparity of fifteen percentage points is much greater in a case where the class or group represents only twenty percent of the general population, than where the class or group represents seventy percent of the population. Similarly, *a disparity of fifteen percentage points is much more significant if it has continued for ten years, than if it has occurred in only one isolated year.* The magnitude of a disparity may also depend on whether the statistics are based on one grand jury venire of thirty people, or on dozens of grand jury venires representing thousands of people.

*Bryant*, 686 F.2d at 1377 (emphasis added).

■ In the present case, the defense conducted two telephone surveys covering a two year period and contacted a total of 739 persons on the juror source list. In addition, the geographically inferred study covered the 7,149 persons on the May 1982 qualified list. We believe that the brief duration and limited sample size of the surveys undermine an inference that substantial underrepresentation of blacks took place over a significant period of time. Those studies which have been found to satisfy *Castaneda*'s requirement of a "sig-

nificant period of time" have covered periods substantially longer than the two years covered by this study. *See Hobby v. United States*, 468 U.S. 339, 341, 104 S.Ct. 3093, 3094, 82 L.Ed.2d 260 (1984) (7 years); *Castaneda*, 430 U.S. at 487, 97 S.Ct. at 1276 (11 years); *Hernandez*, 347 U.S. at 481, 74 S.Ct. at 671 (25 years). Therefore, while the figures presented by Ramseur indicate that the underrepresentation was not random, we find that the figures are insufficient to meet *Castaneda*'s requirement that underrepresentation occur over a significant period of time to comprise an equal protection violation.

■ Moreover, an examination of the source lists reveals that the mechanism used to create the source lists was facially neutral with respect to race. Essex County, New Jersey utilized voter registration and Department of Motor Vehicle lists to create its jury venire. These lists are constituted using facially neutral criteria and allow no opportunity for subjective or racially motivated judgments. *See Alexander*, 405 U.S. at 630, 92 S.Ct. at 1225 (finding discrimination when jury commissioners had "a clear and easy opportunity for racial discrimination"); *Yeager*, 465 F.2d at 280 (striking down system that permitted "tainted subjective decision[s]").[19]

■ When we combine the presence of multiple, facially neutral selection lists with the presence of studies indicating non-random underrepresentation of blacks that cover only two years duration, we find that the "substantial underrepresentation" requirement of *Castaneda* is unfulfilled. Any implication of discrimination provided by Mr. Ramseur's data is undercut both by the limited usefulness of the data itself and the context of the Essex County jury system. Therefore, we conclude that Mr. Ramseur's data is insufficient to support the *presumption* of discrimination necessary under a *Castaneda* equal protection

---

**19.** Furthermore, the presence of multiple sources for jury lists reduces the chance that underrepresentation of a cognizable group on any one source list would be translated to the final jury lists. *See generally*, David Kairys, et al., 65 Cal.L.Rev. at 803–27.

claim in order to create a prima facia case.[20]

■ With regard to Ramseur's Sixth Amendment challenge to the source lists, we conclude that the studies conducted here, which do not reflect substantial underrepresentation over a significant period of time, also do not satisfy *Duren*'s fair cross-section analysis. *Duren*'s second prong requires a cognizable group's representation to be "fair and reasonable in relation to the number of such persons in the community." *Duren*, 439 U.S. at 364, 99 S.Ct. at 668. In making our Sixth Amendment analysis, we use standards that are somewhat different than those under the "substantial underrepresentation" requirement of the equal protection analysis. A significant reason for this is that the focus of Sixth Amendment protections, more than Fourteenth Amendment protections, is upon the concept of the jury as a system rather than upon individual rights. As Justice White stated in *Taylor v. Louisiana:*

> The purpose of a jury is to guard against the exercise of arbitrary power—to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge. . . . This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool. Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system. Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial. "Trial by jury presupposes a jury drawn from a pool broadly representative of the community as well as impartial in a specific case. . . . [T]he broad representative character of the jury should be maintained, partly as assurance of a diffused impartiality and partly because sharing in the administration of justice is a phase of civic responsibility."

419 U.S. at 530–31, 95 S.Ct. at 697–98 (quoting *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 227, 66 S.Ct. 984, 989, 90 L.Ed. 1181 (1946) (Frankfurter, J., dissenting); other citations omitted).[21]

■ Therefore, a Sixth Amendment analysis will examine whether a group's representation on jury lists is "unfair" such that the proper functioning of the jury system is threatened. We believe that

---

**20.** It is possible, however, that were Mr. Ramseur's data more comprehensive a presumption of discrimination would exist. The New Jersey Supreme Court explained:

> We may assume, although defendant did not attempt to prove, that a major reason for the apparent underrepresentation of blacks in Essex County jury pools is the likelihood that proportionally more blacks than whites do not register to vote and do not have driver's licenses. Knowing this, jury officials may not sit by idly in the belief that no constitutional complaint may be lodged against a random selection mechanism that relies upon facially "neutral" voter and DMV lists. That belief would be mistaken, for such inaction in the face of knowledge of the system's underrepresentativeness would indicate that the underrepresentation has a systematic and partly subjective cause, has continued over a significant period of time, and is not being counteracted by efforts at reform. Thus, even though the numbers shown here are arguably within acceptable limits, if they were to continue over a significant period of time, the continued exclusive reliance by jury officials on the voter and DMV lists could become constitutionally suspect.

*Ramseur,* 106 N.J. at 227, 524 A.2d at 239.

**21.** *See also* Akhil R. Amar, *The Bill of Rights as a Constitution,* 100 Yale L.J. 1131, 1182–1199 (1991). Professor Amar explains that the jury was historically conceived of and serves as an important institution to insulate localities from federal power. "Just as state legislators could protect their constituents against central oppression, so too jurors could obviously 'interpose' themselves against central tyranny through the devices of presentments, nonindictments, and general verdicts. As with the militia, the jury would be composed of Citizens from the same community and its actions were expected to be informed by community values." *Id.* at 1186. The implication of this vision of the jury and the Sixth Amendment is that the primary importance of Sixth Amendment protections is structural in nature.

factors such as the nature of the process by which jury lists are composed, the length of time of underrepresentation, and the strength of the evidence that purports to establish an "unfair and unreasonable" representation should be examined under *Duren.* *See, e.g., Ford v. Seabold,* 841 F.2d 677, 685 (6th Cir.1988), *cert. denied,* 488 U.S. 928, 109 S.Ct. 315, 102 L.Ed.2d 334 (1988) (examining length of time of underrepresentation and nature of process by which jury lists are composed); *Timmel v. Phillips,* 799 F.2d 1083, 1086 (5th Cir.1986) (same); *United States v. LaChance,* 788 F.2d 856, 866–69 (2d Cir.1986) (examining length of time of underrepresentation and strength of evidence that purports to establish an unfair and unreasonable representation).

■ In the present case, the evidence does not convincingly demonstrate that the representation of African–Americans on jury pools was unfair or unreasonable. The length of time documented by Ramseur's studies was only two years. Moreover, the selection process was facially neutral and included names from both the voter registration and DMV lists. Additionally, the New Jersey Supreme Court found it significant that these lists were employed as part of an on-going effort in New Jersey to increase the representativeness of the State's jury lists:

> [W]e look to the State's efforts at reform. We are not dealing here with a system in which there has been long-standing abuse with no attempts at reform. New Jersey has been conscious of its obligation to achieve greater neutrality and representativeness in its jury selection system. The addition of the DMV lists in 1979—at a time when very few jurisdictions, state or federal, required the use of multiple lists in addition to voter lists—was obviously intended to broaden the representativeness of the pool. In addition, a 1981 Task Force chaired by Justice Clifford to study the current jury system has made numerous recommendations that may serve to increase the representativeness of juries. We are certain that those currently working on improvements in jury proce-

dures will continue to seek to improve the yield of jurors from the source lists. *Ramseur,* 106 N.J. at 226, 524 A.2d at 239. Such efforts at reform to increase the representativeness of jury lists have some relevance to the question of whether a group's representation on those lists is "fair and reasonable." If a system appears *ex ante* likely to create representative jury lists there should be some presumption of its legitimacy, even though evidence *ex post* may demonstrate that the lists are not representative enough. We find the evidence *ex post* presented in this case insufficient to establish that Essex County's jury selection system was unfair and unreasonable enough to constitute a Sixth Amendment violation.

We hold, therefore, that Ramseur has not made a prima facie showing that the use of these juror source lists denied him his rights under the Equal Protection Clause of the Fourteenth Amendment, nor has he established a denial of his right to trial by a fair cross-section of the community guaranteed by the Sixth Amendment.

## IV.

Next, Ramseur contends that the manner in which grand jury forepersons are selected by Essex County assignment judges violates the Equal Protection Clause of the Fourteenth Amendment as well as the Sixth Amendment's guarantee of a trial by a jury drawn from a cross-section of the community. We look first to the methods employed in the selection of forepersons in Essex County.

Once a grand jury is chosen in Essex County, the assignment judges use their discretion in choosing a foreperson and deputy foreperson. The judges review all the questionnaires and proffered excuses prior to empaneling the jury, and once the jury is empaneled, the judges confer with the grand jury manager to determine which jurors would make the best forepersons and deputies.

The assignment judges, who testified in Ramseur's New Jersey state court proceedings about the procedures employed in Es-

sex County to select grand jury forepersons, related that race was a factor in their choice of a foreperson or deputy foreperson. One judge stated, "When their names were called to serve as jurors I would observe them, I would determine whether they were black or white because, obviously, that does not appear in the questionnaire and it does not appear on the jury list and so I had no way of knowing whether or not all of these people were Caucasian or black or Chinese or what they were." App. at 3791. Another judge explained:

My ultimate choice may be based upon my desire to get a cross-section even in the selection of the foreperson or deputy foreperson; although as I indicated before, I do not think that is a requirement. I think that there should be a certain number of men and I think there should be a certain number of women and I think there should be a certain number of blacks and Hispanics and whites and laboring groups and executive groups and housewife groups who should not only be on the Grand Jury body but even sharing as foreperson or deputy foreperson.

App. at 3880.

To support his allegation that grand jury forepersons were chosen in a manner violative of the Constitution, Ramseur contacted thirty-three of the sixty-six persons who served as grand jury forepersons between the start of the 1979 Term and September of 1982, the month in which Ramseur was indicted. Ramseur's survey determined that only two, or 6.1%, of the thirty-three former forepersons contacted were African–American, although 35.9% of the voting population was African–American.[22]

Turning first to Ramseur's Sixth Amendment challenge, the constitu-

tional guarantee of a speedy trial by an "impartial jury" demands that jury members be drawn from a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 527, 95 S.Ct. 692, 696, 42 L.Ed.2d 690 (1975). At the outset it should be noted that this guarantee differs substantially from the protections that flow from the Equal Protection Clause. *See United States v. Musto*, 540 F.Supp. 346, 362 (D.N.J.1982), *aff'd sub nom., United States v. Aimone*, 715 F.2d 822 (3d Cir. 1982). In equal protection analysis, the focus is on purposeful discrimination against individuals, whereas in a fair cross-section challenge "the focus is not on discriminatory conduct but instead is on whether the jury selection system is impartial and will yield a microcosm of the community which can fairly represent the views of all persons within the society." *Id.* (citing *Taylor*, 419 U.S. at 522, 95 S.Ct. at 692). Unlike the equal protection analysis under the Fourteenth Amendment or the analogous equal protection analysis under the Fifth Amendment which are based primarily upon directly protecting individuals from government abuse, the "fair cross-section" analysis under the Sixth Amendment, as we note in Section III above, is grounded primarily to provide "jury review" as a buffer for the people from the abuses of government power. The emphasis is on the system and its proper functioning rather than on the individual citizen.[23] Because of these differing emphases of the Sixth and Fourteenth Amendments, decisions of other courts holding that forepersons occupy constitutionally significant positions for equal protection purposes do not compel the conclusion that, as a matter of law, the role of foreperson is constitutionally significant in the context of a Sixth Amendment challenge. *See Musto*, 540 F.Supp. at 360–61.[24]

---

**22.** The survey also revealed that only 25.8% of the thirty-three were female, compared to the 53.2% of the voting population which was female.

**23.** *See* Amar, 100 Yale L.J. at 1182–89 and discussion *supra* note 15.

**24.** In *Rose v. Mitchell*, 443 U.S. at 551–52 n. 4, 99 S.Ct. at 2998 n. 4, the Supreme Court "as-

sume[d] without deciding that discrimination with regard to the selection of only the foreman" would require setting aside the defendant's conviction. Some courts have used the Supreme Court's dicta in *Rose* as grounds for holding that the role of grand jury foreperson is constitutionally significant for Sixth Amendment purposes. However, *Rose* involved a claimed equal protection violation, not a Sixth

■ Instead, when a defendant alleges that fair cross-section values are tainted by the underrepresentation of a particular group in the office of grand jury foreperson, the defendant must show that the office of foreperson carries with it some power to affect the deliberative process of the array which otherwise represents a cross-section of the community. As one district court has aptly observed:

> When a group as a whole is excluded or significantly underrepresented on a jury, the defendant is denied the attitudes, experiences, outlook, and accumulated wisdom of that group. The relevance of the similar question to the office of foreperson, however, is not so clear. Assuming a fair cross-section on the jury as a whole, the defendant enjoys the richness of the community's general make-up, even where certain groups are underrepresented as forepersons. The benefit of the fair cross-section to the defendant is destroyed only if the "impact of the grand jury foreperson is so substantial as to influence or alter the unique qualities and characteristics of the jury's individual members."

*United States v. Cabrera–Sarmiento,* 533 F.Supp. 799, 808 (S.D.Fla.1982) (citations omitted).

■ The successful defendant will show that the foreperson alters the representative character of the jury when the foreperson exerts an "overpowering influence" over the other jurors such that their views are substantially diminished during the deliberative process. *See Musto,* 540 F.Supp. at 362. If the grand jury foreperson plays no more significant role than any other grand juror and "jury arrays are representative of the community," Sixth Amendment values are not disturbed even if there is underrepresentation in the foreperson position. *Id.* In *Musto,* a case involving the role of the foreperson in a federal grand jury, the court determined that no Sixth Amendment violation existed because the role of the federal grand jury foreperson was purely ministerial and such

a foreperson would be unlikely to affect improperly an otherwise representative array of grand jurors. *Id.* Similarly, we must determine whether Essex County grand jury forepersons "have such a significant impact on the criminal justice system that discrimination in their selection amounts to a constitutional violation." *United States v. Aimone,* 715 F.2d 822, 826 (3d Cir.1983).

■ The Supreme Court of New Jersey concluded that the duties of the grand jury foreperson in Essex County were "not constitutionally significant." *Ramseur,* 106 N.J. at 238, 524 A.2d at 244. Because forepersons in Essex County have no more significant powers than federal grand jury forepersons, whom we determined in *Aimone* do not play a constitutionally significant role in the indictment process, we agree with the district court's conclusion that the role of Essex County foreperson is not constitutionally significant in a fair cross-section challenge of this nature. Therefore, we hold that even if African–Americans and women were underrepresented in the position of foreperson in Essex County, such underrepresentation did not violate the Sixth Amendment because their underrepresentation had no significant impact on the otherwise representative array of the panel.

■ With regard to Ramseur's equal protection challenge, unlike a Sixth Amendment challenge, an equal protection challenge to the selection of grand jury forepersons does not require that the forepersons' role be more than ministerial or invested with substantial influence. Because the Fourteenth Amendment focuses primarily upon direct protection for individuals, any invidious discrimination in the jury selection process gives rise to an equal protection challenge to that discrimination. *See Georgia v. McCollum,* —— U.S. ——, ——, 112 S.Ct. 2348, 2352, 120 L.Ed.2d 33 (1992) (noting that "the harm from discriminatory jury selection extends beyond that

Amendment violation. As we have noted, the concerns underlying each of these constitutional protections are different.

inflicted on the defendant and the excluded juror to touch the entire community" and that equal protection analysis serves to "remedy the harm done to the dignity of persons and to the integrity of the courts") (quotations omitted).

The State of New Jersey contended that *Hobby v. United States,* 468 U.S. 339, 104 S.Ct. 3093, 82 L.Ed.2d 260 (1984), governs the outcome of Ramseur's equal protection challenge. We find the state's reliance on *Hobby* misplaced. In *Hobby,* the Supreme Court held that, even if discrimination was a factor in the selection of federal grand jury forepersons, such discrimination did not constitute a violation of the Due Process Clause of the Fifth Amendment justifying reversal of the petitioner's conviction or the dismissal of the indictment. In reaching its conclusion, the Court examined the role of the foreperson in a federal grand jury and found it to be insignificant because "discrimination in the selection of one person from among the members of a properly constituted grand jury can have little, if indeed any, appreciable effect upon the defendant's due process right to fundamental fairness." 468 U.S. at 345, 104 S.Ct. at 3096.

■ In *Rose v. Mitchell,* 443 U.S. 545, 551 n. 4, 99 S.Ct. 2993, 2998 n. 4, 61 L.Ed.2d 739 (1979), a case in which the petitioner alleged that his rights under the Equal Protection Clause had been violated, the Court assumed without deciding that discrimination in the selection of a grand jury foreperson would violate equal protection and require that a conviction be set aside. The Court's analysis in *Hobby* regarding the "constitutional" role of the foreperson in the context of a Fifth Amendment due process challenge did not limit the Court's previous analysis in *Rose* with respect to equal protection principles in the grand jury selection process. According to *Rose,* where the claim is injury to equal protection values, the injury occurs whether the discriminatory exclusion affects the selection of individual grand jurors to the panel or the selection of the foreperson from among the grand jurors on the panel. These injuries exist regardless of the ex-

tent of the foreperson's authority which was the Court's principle concern in *Hobby.* *See Johnson v. Puckett,* 929 F.2d 1067, 1071 (5th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 274, 116 L.Ed.2d 226 (1991). Therefore, *Rose,* not *Hobby,* governs the outcome of Ramseur's equal protection claim.

■ The Court in *Rose* cautioned that "[n]otwithstanding these holdings that claims of discrimination in the selection of members of the grand jury are cognizable on federal habeas corpus, and will support issuance of a writ setting aside a state conviction and ordering the indictment quashed, it remains true that to be entitled to habeas relief the [defendant is] required to prove discrimination under the standards set out in this Court's cases." *Id.* 443 U.S. at 564–65, 99 S.Ct. at 3004–05. Therefore, we must now determine if the requirements of *Castaneda,* set forth in Section III of this opinion, have been met with respect to the selection of forepersons in Essex County. We conclude that Ramseur has not established a prima facie case under *Castaneda.*

We conclude that Ramseur's survey of only half of the sixty-six forepersons who served over a three year period did not conclusively establish that the procedure "resulted in substantial underrepresentation of [defendant's] race or of the identifiable group to which he belongs ... over a significant period of time." *Castaneda,* 430 U.S. at 494, 97 S.Ct. at 1280. As noted in our discussion of Ramseur's study of Essex County's grand jury venire, *see supra,* a three year study which covers only half of the group at issue does not comport with cases in which courts have found violations of the standards set forth in *Castaneda.* Moreover, a sampling of only half of the jury forepersons who served could skew the results. First, it is possible that those contacted do not represent the entire three year period purportedly covered by the study. Second, it is possible that, even if such a sample did span the entire period, it might represent merely a series of sporadic periods of underrepresentation rather than one that continued "over a significant

period of time." Ramseur's study is thus insufficient to establish a constitutional violation under *Castaneda*. Therefore, we hold that Ramseur has not made a successful equal protection challenge with respect to the selection of grand jury forepersons in Essex County.

## V.

Finally, we address Ramseur's contention that misconduct by the prosecutor denied him his right to a fair trial in violation of the Sixth Amendment. The conduct alleged to be improper includes: (1) the prosecutor's reference to matters outside of the evidence; (2) the prosecutor's testimony regarding his personal opinion as to the veracity of testimony and Ramseur's guilt; (3) the prosecutor's ridicule of defense experts that allegedly resulted in their impeachment; (4) the prosecutor's misstatements about and improper use of evidence; and (5) the prosecutor's mischaracterization of the defense.

■■■ At the outset we make the observation that "not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the administration of justice.'" *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974) (quoting *Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 289, 86 L.Ed. 166 (1941)). Instead, our review of a prosecutor's conduct in a state trial on application for a writ of habeas corpus is limited to determining whether the prosecution's conduct "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process." *Greer v. Miller*, 483 U.S. 756, 765, 107 S.Ct. 3102, 3108, 97 L.Ed.2d 618 (1987) (quoting *Donnelly*, 416 U.S. at 643, 94 S.Ct. at 1871); *Lesko v. Lehman*, 925 F.2d 1527, 1546 (3d Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 273, 116 L.Ed.2d 226 (1991). While the line is sometimes a fine one, "[i]t is essential to distinguish between ordinary trial error and that sort of egregious misconduct which amounts to a denial of constitutional due process." *United States ex rel. Perry v. Mulligan*, 544 F.2d 674, 678 (3d Cir.1976), *cert. denied*, 430 U.S. 972, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977).

■■■ In evaluating whether the prosecutor's misconduct rose to the level of constitutional violation, we must examine that conduct in the context of the trial as a whole. *See Greer*, 483 U.S. at 766, 107 S.Ct. at 3109 (determining whether "remarks, in the context of the entire trial, were sufficiently prejudicial to violate respondent's due process rights") (quoting *Donnelly*, 416 U.S. at 639, 94 S.Ct. at 1869); *see also United States v. Adams*, 759 F.2d 1099, 1111 (3d Cir.), *cert. denied*, 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985) (examining the "context of the entire trial"). We conclude, as did the New Jersey Supreme Court, that although there were instances in which the prosecution's conduct might be deemed inappropriate, any error which resulted was harmless in light of the entire fourteen day trial. *See Ramseur*, 106 N.J. at 319–24, 524 A.2d at 288–90. Moreover, whenever the improper conduct was objected to by the defense, the trial court sustained the valid objections and gave the jury proper limiting instructions. *Cf. Adams*, 759 F.2d at 1111 ("prosecutor's remarks, if improper at all, were either trivial or could have been blunted by a curative instruction that appellants did not request"). Therefore, we will affirm the district court's determination that the prosecutor's conduct was not so egregious as to amount to a denial of Ramseur's constitutional rights.

## VI.

For the foregoing reasons, we will affirm the district court's denial of Thomas Ramseur's petition for a writ of habeas corpus.

GREENBERG, Circuit Judge, concurring.

I join in Judge Roth's opinion for the court and the judgment reached but express one reservation regarding the opinion which may have significant implications for

future cases.[1] The parties have briefed and argued the case on the assumption that if there was a constitutional violation in the selection of the grand jury which indicted Ramseur either by reason of the excusing of particular persons from service on it or because of the overall method of selection of grand juries in Essex County at the time of his indictment, he will be entitled to a new trial. Judge Roth's opinion agrees with this assumption. Typescript at 13 n. 5.

Nevertheless, this assumption might not be correct. There is no federal constitutional requirement that states try criminal cases, even for murder, only after the defendant is indicted. *See Hurtado v. California,* 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884); *United States ex rel. Wojtycha v. Hopkins,* 517 F.2d 420, 425 (3d Cir.1975). Thus, in New Jersey, indictments are required, unless waived, in criminal cases only as a matter of state law. Of course, since New Jersey uses the indictment system, it may not exclude a potential juror from service on the grand jury on the basis of race. Accordingly, a petitioner tried in a New Jersey court on an indictment returned by a grand jury from which jurors have been excluded on a racial basis is entitled to federal habeas corpus relief, provided that the other prerequisites to relief are satisfied. *See Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986).

In *Vasquez* the Court indicated that the relief granted in a habeas corpus proceeding to a successful petitioner is a "reversal of the conviction." *Id.* at 255, 106 S.Ct. at 619. Nevertheless, a federal habeas proceeding is a civil action separate from the criminal case so that when a petitioner is successful, the federal court "cannot revise the state court judgment; it can act only on the body of the petitioner." *Fay v. Noia,*

372 U.S. 391, 431, 83 S.Ct. 822, 844, 9 L.Ed.2d 837 (1963).[2] *See also Sedivy v. Richardson,* 485 F.2d 1115, 1117 (3d Cir. 1973), ("federal habeas corpus [is] an inquiry into 'detention *simpliciter,'* [and] is not a direct review of a state or military court judgment"), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1559, 43 L.Ed.2d 774 (1975). Therefore, a "reversal" of a conviction in a habeas case does not disturb the judgment of conviction and accordingly it differs from a conventional reversal on a direct appeal.

Thus, a court granting habeas relief will specify what must be done if the petitioner is to be retained in custody. Obviously if an indictment is tainted because the court excluded grand jurors on a racial basis a new indictment will be required for, as indicated in *Vasquez,* "a conviction cannot be understood to cure the taint attributable to a charging body selected on the basis of race [for] we simply cannot know that the need to indict would have been assessed in the same way by a grand jury properly constituted." *Id.* at 264, 106 S.Ct. at 624.

But it does not necessarily follow that simply because a conviction cannot cure an earlier defective indictment, a valid indictment for the precise offense of which the petitioner was convicted cannot cure an earlier conviction defective only because the original indictment was flawed. In fact, it would seem logical to hold that if an otherwise valid conviction must be reversed solely because the indictment on which it was predicated was constitutionally defective, when a new indictment is returned for the offense for which the petitioner was convicted, the judgment of conviction which was reversed only in the limited sense that it could not be the basis for holding the petitioner in custody may then be recognized as valid for that purpose.

---

1. While Ramseur's case has failed on the facts, in view of the system used for grand jury selection in Essex County when he was indicted it is possible that some other petitioner will be able to make a showing that in his or her case grand jurors were excused on a racial basis.

2. *Fay v. Noia* was overruled on other grounds in *Coleman v. Thompson,* ⎯ U.S. ⎯, ⎯, 111

S.Ct. 2546, 2562, 115 L.Ed.2d 640 (1991). But in *Coleman* the Court reaffirmed *Fay v. Noia* on the point for which I cite it as the Court indicated that when a federal court reviews a state prisoner's habeas petition it "does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter.*" *Id.* at ⎯, 111 S.Ct. at 2554.

The Court in *Vasquez* did not address this possibility nor did it do so in *Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), on which it relied in *Vasquez*, though the Court did indicate that remedies other than reversal to cure the discrimination in the selection of grand jurors "are ineffectual." *Vasquez*, 474 U.S. at 262 n. 5, 106 S.Ct. at 623 n. 5. Accordingly, while there can be no doubt that the Court in *Vasquez* affirmed a judgment of the court of appeals providing that the petitioner was to be released unless retried, the Court did not consider whether the return of a new indictment in itself could justify the holding of the petitioner in custody. Therefore, we should not consider that possibility foreclosed as an inferior federal court should not be quick to hold that the Supreme Court has rejected an argument it never considered. *See Blasband v. Rales*, 971 F.2d 1034, 1042–43 (3d Cir.1992).

My suggestion that the return of a valid indictment following a conviction might justify the recognition of the state judgment as valid does not introduce a harmless error analysis into cases dealing with racial discrimination in grand jury selection. Quite to the contrary it treats the discrimination as prejudicial and addresses the remedy for it. Furthermore, my suggestion is consistent with the requirement in *Vasquez* that convictions based on constitutionally invalid indictments must be reversed for I am only dealing with the procedures which follow a reversal.

My suggested analysis is dependent upon the law that there is no federal constitutional right to indictment in state criminal cases for in the absence of such a right it may plausibly be contended that there cannot be a federal right to a valid indictment *before* the conviction. Arguably the federal constitutional right to a valid indictment would be vindicated fully by an indictment returned after the trial because a post-trial indictment would satisfy the Court's concern in *Vasquez* that "we simply cannot know that the need to indict would have been assessed in the same way by a grand jury properly constituted." *Vasquez*, 474 U.S. at 264, 106 S.Ct. at 624. Obviously, if

a grand jury after a trial indicts a defendant then a court will know how it assessed the need to indict.

Of course, I recognize that a state court might feel obliged as a matter of state law to set aside a conviction returned on the basis of an indictment held invalid under federal law. But that would not be a federal court's concern. *See Geschwendt v. Ryan*, 967 F.2d 877, 889 (3d Cir.) (in banc), *cert. denied*, —— U.S. ——, 113 S.Ct. 472, 121 L.Ed.2d 379 (1992).

The analysis I am suggesting finds support in our case law in which in proceedings under 28 U.S.C. § 2255, following *federal* convictions, we limit remedies for constitutional violations to the problem at hand but go no further. Thus, we recently held in *United States v. Day*, 969 F.2d 39 (3d Cir.1992), that a petitioner who turned down an advantageous plea offer before trial and later was convicted might be entitled to accept the offer even after trial if he rejected the offer because of constitutionally deficient advice from an ineffective attorney. In *Day* we quoted from *United States v. Morrison*, 449 U.S. 361, 364, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981), that a remedy for a Sixth Amendment violation "should be tailored to the injury suffered and should not unnecessarily infringe on competing interests." Earlier in *United States v. DeFalco*, 644 F.2d 132 (3d Cir. 1979) (in banc), we held that absent his waiver to effective assistance of counsel on direct appeal, a petitioner whose conviction had already been affirmed would be entitled to an appeal *de novo* from his conviction if his attorney on his direct appeal pleaded guilty to criminal charges in the district court before the petitioner's appeal was decided.

*Day* and *DeFalco* are instructive for they respectively involved alleged constitutional violations before and after the trial and in neither case did we suggest that the remedy should be a new trial. Rather, in the words of *Morrison*, we tailored the remedy "to the injury suffered." If we did that in federal cases in which we were not concerned with federal-state comity interests, it reasonably can be argued that we

should be at least as reluctant in a federal habeas corpus case following a state conviction to grant a remedy which forever invalidates a conviction as a basis to hold a petitioner in custody when the constitutional flaw arguably can be isolated from the trial. *Day* may be particularly significant in this regard because if the petitioner in that case was correct in his contentions then he should have never been tried.

In view of the aforesaid I write separately to state my view that it should not be assumed from the court's opinion in this case that a petitioner successfully challenging the composition of the grand jury on the ground that jurors were excluded from it on a racial basis necessarily is entitled to a new trial. I regard the question as open as it does not have to be decided here.

ALITO, Circuit Judge, concurring.

I concur in all but Part II of the opinion of the court.[1] I agree with the conclusion reached in part II—that a writ of habeas corpus should not be issued based on Ramseur's claim of discrimination in the grand jury selection process—but I arrive at that conclusion by a somewhat different process of reasoning.

1. First, I do not think that it is necessary to reach the question whether Ramseur's own equal protection rights would have been violated if the composition of the grand jury had been affected by the assignment judge's announced policy of taking race into account for the purpose of empaneling a grand jury with the same makeup as the population of the county. I fully agree with the court that the record does not show that any person was excluded on

racial grounds from the grand jury that indicted Ramseur, and it seems perfectly clear that Ramseur's own equal protection rights could not have been violated in the absence of such an effect. I would therefore go no further and would not express any view on the hypothetical question whether Ramseur's own equal protection rights would have been violated had such exclusion been shown.

The court seems to regard it as well settled that a defendant's own equal protection rights are violated whenever race is taken into account in the grand jury selection process—even if the purpose and effect is to empanel a grand jury that constitutes a cross-section of the community. While the court may be correct, I am less sure.

I recognize that the Supreme Court has held for more than a century that a defendant's conviction must be overturned on equal protection grounds if members of the defendant's race or ethnic group were barred by law from serving on the grand jury, *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1880), or if discriminatory practices caused members of the defendant's race or ethnic group to be substantially underrepresented on the grand jury.[2] These decisions appear to have been based in part on the harm caused by such discrimination to those who were denied the opportunity to serve on grand juries or to the community at large.[3] To the extent that these decisions relied on unequal treatment of the defendants themselves, the Court appears to have reasoned that the defendants were treated unequally because, as a

---

1. I also agree with the logic of Judge Greenberg's concurring opinion.

2. *Neal v. Delaware*, 103 U.S. 370, 26 L.Ed. 567 (1881); *Bush v. Kentucky*, 107 U.S. 110, 1 S.Ct. 625, 27 L.Ed. 354 (1883); *Carter v. Texas*, 177 U.S. 442, 20 S.Ct. 687, 44 L.Ed. 839 (1900); *Rogers v. Alabama*, 192 U.S. 226, 24 S.Ct. 257, 48 L.Ed. 417 (1904); *Pierre v. Louisiana*, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757 (1939); *Smith v. Texas*, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1941); *Hill v. Texas*, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942); *Akins v. Texas*, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945); *Patton v. Mississippi*, 332 U.S. 463, 68 S.Ct. 184, 92

L.Ed. 76 (1947); *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); *Reece v. Georgia*, 350 U.S. 85, 76 S.Ct. 167, 100 L.Ed. 77 (1955); *Eubanks v. Louisiana*, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958); *Arnold v. North Carolina*, 376 U.S. 773, 84 S.Ct. 1032, 12 L.Ed.2d 77 (1964); *Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221; *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986).

3. *See, e.g., Rose v. Mitchell*, 443 U.S. 545, 555–56, 99 S.Ct. 2993, 2999–3000, 61 L.Ed.2d 739 (1979); *Strauder*, 100 U.S. at 308.

result of discrimination in the grand jury selection process, their cases were presented to grand juries that were less likely to be fair to them than to members of other races or ethnic groups and less likely to be fair to them than would juries selected on a nondiscriminatory basis.[4]

This same reasoning does not apply when a grand jury is selected so that its racial and ethnic composition mirrors that of the community as a whole. (For convenience, I will call such a grand jury a "cross-section grand jury.") Indeed, it is not easy to comprehend how it can be said that a potential defendant is deprived of the equal protection of the laws when his or her case is presented to a cross-section grand jury. Such a grand jury has the same composition as the median grand jury selected by a purely random selection procedure. Since these two grand juries have the same makeup, there is no reason to believe that one will be any fairer or less fair than the other towards potential defendants of any race or ethnic group. And since a potential defendant's equal protection rights are not violated when his or her case is presented to the median randomly selected grand jury, it is unclear why the same conclusion should not follow when the potential defendant's case is presented to a cross-section grand jury.

On the contrary, the use of cross-section grand juries seems likely to result in *more equal* treatment for potential defendants than the use of randomly selected grand juries. The racial and ethnic composition of most randomly grand juries does not mirror that of the community at large. Most contain an over-representation of one group or another. Therefore, these grand juries are, if anything, more likely to treat potential defendants unequally based on racial or ethnic bias than are cross-section grand juries. Furthermore, because a random system tends to produce grand juries that vary in composition, it is more likely under such a system for the treatment of

potential defendants of a particular race or ethnic background to vary depending on the particular grand jury to which their cases are presented. It is therefore difficult to understand how it can be thought that the equal protection rights of potential defendants are violated when their cases are presented to cross-section grand juries but not when their cases are presented to randomly selected grand juries.

To be sure, when the race and ethnic background of potential grand jurors are taken into account in selecting a grand jury, these potential grand jurors are treated differently, and thus it is appropriate to inquire whether their equal protection rights are violated by such a procedure. But the same cannot logically be said about the equal protection rights of potential defendants. For these reasons, if I were writing on a clean slate, I would be inclined to hold that the equal protection rights of defendants are not violated when they are indicted by cross-section grand juries.

We are not, however, writing on a clean slate. While I do not think that the Supreme Court's decisions concerning peremptory challenges and most of its decisions concerning discrimination in the selection of grand and petit jurors are controlling with respect to the point I am discussing, the plurality and concurring opinions in *Cassell v. Texas,* 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950), contain strong statements to the effect that a defendant's equal protection rights are violated by a selection procedure that limits the number of grand jurors of the defendant's race on each panel based on that race's representation in the community. *Id.* at 286, 70 S.Ct. at 631 (plurality); *id.* at 295, 70 S.Ct. at 635 (Frankfurter, J., concurring). The opinion in *Swain v. Alabama,* 380 U.S. 202, 208, 85 S.Ct. 824, 829, 13 L.Ed.2d 759 (1965), contains similar statements. All of these statements are technically dicta, and it seems obvious that the selection system at

---

**4.** *See, e.g., Rose,* 443 U.S. at 555–56, 99 S.Ct. at 2999–3000; *Fay v. New York,* 332 U.S. 261, 285, 67 S.Ct. 1613–16, 91 L.Ed. 2043 (1947); *Strauder,* 100 U.S. at 309. For an analysis of the conceptual problems presented by this reason-

ing, see Barbara D. Underwood, *Ending Race Discrimination in Jury Selection: Whose Right Is It, Anyway?,* 92 Colum.L.Rev. 725, 728–36 (1992).

issue in *Cassell* was nothing more than an effort to minimize desegregation and was thus far different from the system that the assignment judge was openly employing here.[5] Still, we might well be required to give these statements controlling weight if we were forced to decide the hypothetical question whether Ramseur's own equal protection would have been violated if the assignment judge's system had actually affected the composition of the grand jury. But, as previously noted, we are not required to decide that question.[6]

2. This brings me to the question whether the equal protection rights of any of the potential or actual grand jurors were violated. If it were appropriate to reach the merits of this question,[7] we would be required to ask whether the assignment judge's selection procedure satisfied the strict equal protection standard applicable to all racial classifications, that is, whether the selection procedure served a compelling state interest and was narrowly tailored to serve that purpose. *See, e.g., City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493–94, 109 S.Ct. 706, 720–21, 102 L.Ed.2d 854 (1989) (plurality); *id.* at 520, 109 S.Ct. at 735 (Scalia, J., concurring in judgment); *Wygant v. Jackson Board of Education,* 476 U.S. 267, 273–74, 106 S.Ct. 1842, 1846–47, 90 L.Ed.2d 260 (1986) (plurality); *id.* at 284–86, 106 S.Ct. at 1852–53 (opinion of O'Connor, J.). Furthermore, if we found a violation, we might be required to apply the standards generally used for judging the propriety of equal protection remedies. *See, e.g., Board of Education v. Dowell,* 498 U.S. 237, —— – ——, 111 S.Ct. 630, 636–38, 112 L.Ed.2d 715 (1991); *Milliken v. Bradley,* 433 U.S. 267, 282, 97 S.Ct. 2749, 2758, 53 L.Ed.2d 745 (1977). Before reaching the merits of these matters, however, it is first necessary to ask whether Ramseur has standing to assert the equal protection rights of potential or actual grand jurors.

The Supreme Court has held that criminal defendants and civil litigants have

---

**5.** Cassell had been indicted for murder in Dallas County, Texas. Prior to *Hill v. Texas,* 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942), apparently no black had ever served on a grand jury in Dallas County, which led the Court to reverse Hill's rape conviction. *Id.* at 403–04, 62 S.Ct. at 1161. The grand jury system in place at the time involved the selection by the jury commissioners of an initial list of 16, from which a judge would select a panel of 12. *Cassell,* 339 U.S. at 283–84, 70 S.Ct. at 629–30. Following the *Hill* decision, almost every list of 16 potential grand jurors, and most panels of 12 actual grand jurors, contained one black. Apparently, none ever contained more than one. *Id.* at 286, 70 S.Ct. at 631. One in sixteen approximated the proportion of blacks in the county eligible for jury service (i.e., those who had paid poll tax)—6.5%, but not the proportion of blacks in the county population as a whole, which was 15.5% at the previous census. *Id.* at 284–85, 70 S.Ct. at 630.

**6.** Since Ramseur has not invoked 18 U.S.C. § 243, we are likewise not required to decide whether he could assert rights under this statute, which Congress enacted pursuant to Section Five of the Fourteenth Amendment and which criminalizes racial discrimination in the selection of state and federal grand and petit juries. Criminal statutes rarely confer private rights (*see, e.g., Chrysler Corp. v. Brown,* 441 U.S. 281, 316, 99 S.Ct. 1705, 1725, 60 L.Ed.2d 208 (1979)), but in *Peters v. Kiff,* 407 U.S. 493, 505–07, 92 S.Ct. 2163, 2169–71, 33 L.Ed.2d 83 (1972)

(White, J., concurring in the judgment), three Justices concluded that a criminal defendant may assert rights under 18 U.S.C. § 243. But while the Supreme Court has frequently discussed this statute in cases in which defendants challenged their convictions based on discrimination in the jury selection process, it is unclear that the Court has ever held that a criminal defendant can assert rights under the statute as opposed to the Equal Protection Clause itself. *See, e.g., Edmonson v. Leesville Concrete Co., Inc.,* — U.S. ——, ——, 111 S.Ct. 2077, 2087, 114 L.Ed.2d 660 (1991); *Powers v. Ohio,* — U.S. ——, ——, 111 S.Ct. 1364, 1369–70, 113 L.Ed.2d 411 (1991); *Neal v. Delaware,* 103 U.S. 370, 394, 26 L.Ed. 567 (1881).

This could be of some significance in another case, since the Supreme Court has held that Section Five of the Fourteenth Amendment gives Congress authority to enact statutes proscribing certain state practices as violative of the right to equal protection of the laws although the courts would not adjudge the same practices violative of the Equal Protection Clause standing alone. *Katzenbach v. Morgan,* 384 U.S. 641, 648–49, 86 S.Ct. 1717, 1722, 16 L.Ed.2d 828 (1966).

**7.** If a person excluded from a grand jury based on the assignment judge's selection process had commenced a suit challenging that practice, we might be required to decide, before reaching the constitutional question, whether the plaintiff could assert rights under 18 U.S.C. § 243. *See* note 6, *supra.*

third-party standing to assert the rights of prospective petit jurors who are peremptorily challenged because of race. In reaching this conclusion, the Court has reasoned that criminal defendants and civil litigants have a "close relation" to potential trial jurors as a result of *voir dire*. *Powers v. Ohio*, — U.S. —, —, 111 S.Ct. 1364, 1372, 113 L.Ed.2d 411 (1991); *Edmonson v. Leesville Concrete Co., Inc.*, — U.S. —, — — —, 111 S.Ct. 2077, 2087–88, 114 L.Ed.2d 660 (1991). The Court has written that "[*v]oir dire* permits a party to establish a relation, if not a bond of trust, with the jurors. This relation continues throughout the entire trial and may in some cases extend to the sentencing as well." *Powers*, — U.S. at —, 111 S.Ct. at 1372.

I do not think that this reasoning can be applied to a case involving the exclusion of potential grand jurors. An individual whose case is submitted to a grand jury is not present when the members of the grand jury are selected. Thus, this individual generally never even sees any potential grand jurors who are excluded. Moreover, unless this individual testifies before the grand jury, he or she generally never sees the actual grand jury members. And except in very rare circumstances, he or she never learns the grand jurors' names or anything about them. Consequently, I do not see how a "close relation" of the type found in *Powers* and *Edmonson* can be said to exist between a person whose case is presented to a grand jury and potential or actual grand jurors.

Nor do I think that the present case involves the type of "close relation" that the Court found sufficient to sustain third-party standing in *Georgia v. McCollum*, — U.S. —, —, 112 S.Ct. 2348, 2357, 120 L.Ed.2d 33 (1992). There, the Court held that a prosecutor had third-party standing to assert the equal protection rights of potential petit jurors peremptorily struck by a criminal defendant. The Court reasoned that the prosecutor had a close relation with the struck jurors because the state is "the representative of all its citizens." *Ibid.* Obviously, the same is not true for a person like Ramseur. Thus, I do

not think that Ramseur has third-party standing under any theory to assert the rights of potential or actual grand jurors.

This conclusion seems to me entirely consistent with basic principles regarding third-party standing. One of the reasons why the law generally does not allow A to assert B's rights is that A may not think that his or her rights were violated, may not want B to obtain any advantage as a result of the violation of A's rights, or may not agree with the relief that B is trying to obtain. *See Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 80, 98 S.Ct. 2620, 2633, 57 L.Ed.2d 595 (1978); *Singleton v. Wulff*, 428 U.S. 106, 113–14, 96 S.Ct. 2868, 2873–74, 49 L.Ed.2d 826 (1976) (plurality opinion). Under any of these circumstances, a court would not be helping A by allowing B to assert A's rights.

These precise considerations may well apply in the present case. Ramseur wants us to vacate his first-degree murder conviction as a remedy for, among other things, the insult that he claims several black grand jurors suffered when the assignment judge asked them to sit temporarily in the body of the courtroom rather than immediately taking a seat on the panel. But before considering such a remedy, should we not have some indication that the recipients of this treatment actually feel that they were wronged and feel that vacating Ramseur's conviction is an appropriate remedy? We would have such an indication if they had brought suit—as they certainly could have under *Carter v. Jury Commission of Greene County*, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970)—and if they had asked for such relief, but we have no such indication here.

For all we know, these grand jurors may not feel that the assignment judge did anything wrong. After all, the assignment judge was simply attempting to implement in the context of grand jury selection the view that it is permissible and preferable in certain circumstances to abandon strictly "color blind" selection criteria in favor of race-conscious criteria designed to achieve diversity. *See, e.g., Metro Broadcasting*

*Inc. v. FCC,* 497 U.S. 547, 567–68, 110 S.Ct. 2997, 3010–11, 111 L.Ed.2d 445 (1990). Many public officials in New Jersey contend that race-conscious criteria should be used in selecting other participants in the criminal justice system, including judges [8] and prosecutors.[9] Thus, the grand jurors supposedly wronged in this case may well see nothing unusual or improper in what the assignment judge did. They may think that it is a good thing for every grand jury in Essex County to reflect the racial and ethnic diversity of the community. They may feel that this will lead to fairer, more uniform decisions. They may also feel that this will lead to greater community acceptance of grand jury decisions in racially sensitive cases. And even if these grand jurors feel that the assignment judge should not have treated them as he did, they may not want Ramseur to benefit from the wrong done to them. Or they might feel that the relief Ramseur is seeking—the overturning of his conviction—is a misdirected or disproportionate remedy for the wrong they suffered.

Why should we assume that these grand jurors want Ramseur to assert and benefit from their rights? Any such assumption must be based solely on the grand jurors' race, and I believe it is wrong in principle to make such racially based assumptions. It is also empirically inaccurate—as I believe the facts of this case plainly show. Ramseur brutally killed a former female friend on a public street while her young grandchildren and other witnesses looked on.[10] He was indicted by a grand jury 39% of whose members were black, and he was convicted and sentenced to death by a petit jury 58% of whose members were black.[11]

In sum, I would hold that Ramseur's own equal protection rights were not violated in this case and that he lacks standing to assert the rights of actual or potential

grand jurors. On this basis, I concur in the result reached in Part II of the court's opinion.

COWEN, Circuit Judge, dissenting.

I dissent from Part II of the majority's opinion which holds that the procedure for impaneling the grand jury did not violate Ramseur's equal protection rights. The procedure employed by the assignment judge—of temporarily excluding qualified African–American grand jurors and allowing them to serve only on condition that whites were unavailable—does violence to the principle of equal protection and can only undermine public confidence in the justice system. Ramseur is a very unsympathetic defendant, having murdered his girlfriend in front of six witnesses, but the seriousness of his crime is irrelevant to the resolution of his equal protection claim. I believe that the majority arrives at the result it desires through an excessively narrow reading of Supreme Court precedent and by downplaying the fact that prospective African–American jurors, who were qualified and willing to serve, were treated by the judicial system in a degrading and dehumanizing manner.

For over a century, the Supreme Court has held that a defendant is denied equal protection of the law when he is indicted by a grand jury from which members of a cognizable racial group have been purposefully excluded. *Rose v. Mitchell,* 443 U.S. 545, 556, 99 S.Ct. 2993, 3000, 61 L.Ed.2d 739 (1979); *Alexander v. Louisiana,* 405 U.S. 625, 628, 92 S.Ct. 1221, 1224, 31 L.Ed.2d 536 (1972); *Bush v. Kentucky,* 107 U.S. 110, 119, 1 S.Ct. 625, 633, 27 L.Ed. 354 (1883); *Neal v. Delaware,* 103 U.S. 370, 394, 26 L.Ed. 567 (1880). Where sufficient proof of discrimination has been made out, the Supreme Court has uniformly required

---

**8.** 131 N.J.L.J. 1171 *et seq.* (Aug. 10, 1992) (portion of report of New Jersey Supreme Court Task Force on Minority Concerns, Committee on Minority Participation in the Judicial Process).

**9.** 132 N.J.L.J. 979 (Dec. 14, 1992) (reporting governor's promises regarding selection of new Essex County prosecutor).

**10.** *State v. Ramseur,* 106 N.J. 123, 524 A.2d 188, 206–07 (1987).

**11.** The New Jersey Supreme Court reversed his death sentence on procedural grounds. *State v. Ramseur, supra.*

that the defendant's conviction be set aside and the indictment returned by the unconstitutionally selected grand jury be quashed. *Rose,* 443 U.S. at 556 & n. 3, 99 S.Ct. at 2998 & n. 3.

These principles have been developed because discrimination in the selection of a grand jury panel "strikes at fundamental values of our judicial system and our society as a whole." *Id.* Even the earliest cases in which the Court applied the Equal Protection Clause in the context of racial discrimination in grand jury selection reflect a concern with "the fundamental social values the Fourteenth Amendment was adopted to protect, even though it addressed the issue in the context of reviewing an individual criminal conviction." *Id.* at 555, 99 S.Ct. at 2999; *see Strauder v. West Virginia,* 100 U.S. 303, 308, 25 L.Ed. 664 (1880). Racial discrimination in the selection of a grand jury "impairs the confidence of the public in the administration of justice." *Rose,* 443 U.S. at 556, 99 S.Ct. at 3000. Just as illegal and unconstitutional jury selection procedures create the appearance of bias in an individual case, so they increase the possibility of actual bias as well. *Peters v. Kiff,* 407 U.S. 493, 503, 92 S.Ct. 2163, 2168, 33 L.Ed.2d 83 (1971).

In a recent series of cases, the Supreme Court has affirmed its commitment to the century-old principle that race cannot be a consideration in jury selection. In *Batson v. Kentucky,* 476 U.S. 79, 95–96, 106 S.Ct. 1712, 1722, 90 L.Ed.2d 69 (1986), the Court concluded that a prima facie case of purposeful discrimination under the Fourteenth Amendment is established if the defendant can show that *in his case* the prosecutor exercised peremptory challenges to remove members of the defendant's race from the venire, rather than show systematic exclusion of a cognizable group over a period of time.[1] The holding of *Batson* has since been extended to prohibit race-based peremptory challenges by criminal defense lawyers, *Georgia v.*

*McCollum,* — U.S. —, —, 112 S.Ct. 2348, 2356, 120 L.Ed.2d 33 (1992), by private civil litigants, *Edmonson v. Leesville Concrete Co.,* — U.S. —, —, 111 S.Ct. 2077, 2087, 114 L.Ed.2d 660 (1991), and in cases where the juror and defendant are of different races, *Powers v. Ohio,* — U.S. —, —, 111 S.Ct. 1364, 1370, 113 L.Ed.2d 411 (1991).

Though *Batson* and its progeny involved the actual exclusion of jurors, the Court's reasoning in those opinions was not dependent upon the fact of exclusion. Race-based peremptory challenges violate the equal protection clause because defendants have the right to be tried by juries selected through non-discriminatory means. *Powers,* — U.S. at —, 111 S.Ct. at 1367. "The Constitution prohibits all forms of purposeful racial discrimination in selection of jurors." *Batson,* 476 U.S. at 88, 106 S.Ct. at 1718. The Court did not outlaw race-based peremptory challenges because an excluded juror might have helped the defendant, but because they cast doubt on the integrity of the judicial process and the fairness of criminal proceedings. *Powers,* — U.S. at —, 111 S.Ct. at 1371. This position is consistent with precedents describing the harm caused by discrimination in the grand jury selection process:

> The harm is not only to the accused, indicted as he is by a jury from which a segment of the community has been excluded. It is to society as a whole. 'The injury is not limited to the defendant— there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts.'

*Rose,* 443 U.S. at 556, 99 S.Ct. at 3000 (quoting *Ballard v. United States,* 329 U.S. 187, 195, 67 S.Ct. 261, 265, 91 L.Ed. 181 (1946)). Thus, our primary concern in a case like this one is with the harm caused to the justice system itself, a harm that is not cured by the ultimate inclusion of some African–Americans on Ramseur's grand

---

**1.** The Court's conclusions in *Batson* regarding proof of purposeful discrimination in petit jury selection are equally applicable in the grand jury context. 476 U.S. at 84 n. 3, 106 S.Ct. at 1716 n. 3 (quoting *Alexander v. Louisiana,* 405

U.S. 625, 626 n. 3, 92 S.Ct. 1221, 1223 n. 3, 31 L.Ed.2d 536 (1972)). Ramseur need only demonstrate purposeful discrimination in the selection of the grand jury panel which indicted him to establish a Fourteenth Amendment violation.

jury panel. It is the presence or absence of purposeful discrimination in the selection process, not necessarily the exclusion of jurors, which determines whether Ramseur's equal protection rights have been violated.

The majority contends that there was no purposeful discrimination because (1) no juror was excluded and (2) the assignment judge did not have an invidious, discriminatory intent. We question both conclusions. On the record before us, it cannot be said for certain that any prospective grand jurors were actually excluded from service because of their race. The record indicates that the assignment judge asked five prospective grand jurors who were willing to serve to sit aside for possible later selection. In chronological order, they were George Smith, Esther Catagen, Betty Patrick, Francena Hardwick, and Orro Ikena. After asking the third prospective juror, Betty Patrick, to sit aside, the judge announced that he had "asked two of the blacks who have indicated a willingness to serve to sit in the body of the courtroom." App. at 2449. This statement indicates that at least two prospective grand jurors were temporarily excluded because they were African–American. Shortly thereafter, the judge asked two more prospective grand jurors who were willing to serve, Francena Hardwick and Orro Ikena, to sit aside for possible later selection. Significantly, Ms. Hardwick was *never* chosen for service. Because the judge announced moments earlier that he was asking African–Americans to sit in the body of the courtroom rather than on the panel, it is reasonable to conclude that Ms. Hardwick, the permanently excluded juror, was African–American and was denied a seat on the panel because of her race. I draw this conclusion not because I believe that exclusion is necessary to establish an equal protection violation, but because the majority relies so heavily on the alleged lack of exclusion to argue that discrimination did

not occur. On this record, I think that Ramseur established by a preponderance of the evidence that a juror was permanently excluded because of her race.[2]

Furthermore, though we know that at least two African–American grand jurors were temporarily excluded because of their race, we cannot say for certain that *only* two jurors were treated that way. At a hearing on Ramseur's allegations, the assignment judge testified that he tried to select a diverse jury based on race, sex, and background. But during his actual impaneling of Ramseur's grand jury a year and a half earlier, he stated only that he was asking African–Americans to sit aside to achieve his desired mix. On this record, therefore, it is very possible that more than two, and perhaps even all five, of the prospective jurors were forced to sit aside on account of their race.

Because the harm in discriminatory selection procedures is to the jury system as a whole and the public's confidence therein, and not only to the individual defendant, I believe it is immaterial, for equal protection analysis purposes, that two or more African–American jurors whom the judge asked to sit aside ultimately served as panel members. Regardless of whether any African–American grand juror was actually excluded from serving on the panel that indicted Ramseur, the selection procedures used in this case violated Ramseur's right to equal protection of the law because the assignment judge engaged in purposeful discrimination.

Clearly there was a deliberate, albeit possibly only temporary, setting aside of a minimum of two prospective grand jurors solely because they were African–American. On this record, it is quite possible that as many as five jurors were discriminated against because they were African–American. They were singled out by the assignment judge before the entire panel

---

2. The majority states that it is impossible to determine from the record Ms. Hardwick's race or the reason for her exclusion. In that case, we should remand to the district court for further factual findings. The district court easily should be able to determine, at least, Ms. Hard-wick's race. If we knew for certain that she is African–American, then in light of the assignment's judge's statement that he was asking African–Americans to sit aside, we would have substantial evidence of a grand juror's exclusion because of her race.

as being ineligible to serve solely because of their race. Moreover, both Essex County assignment judges readily admitted that at the time Ramseur was indicted, African–Americans were routinely excluded from grand jury service if the judge decided that a randomly selected panel contained too many African–Americans or if the judge thought a particular juror was "undesirable." Finally, even if the two African–American jurors initially asked to sit aside were later asked to serve as panel members, they were asked to serve only at the very last moment, suggesting that they were chosen by the assignment judge as a "last resort," further sullying the selection process. I believe that this race-based selection procedure constituted purposeful discrimination under the principles announced by the Supreme Court and thus violated the Equal Protection Clause.

The majority argues that the assignment judge did not engage in purposeful discrimination because he was not trying to proportionally limit the number of African–American jurors, but instead was trying to achieve the non-invidious objective of a representative jury. Aside from the fact that his allegedly "non-invidious" objective violated both federal and state law, *see Cassell v. Texas,* 339 U.S. 282, 286–87, 70 S.Ct. 629, 631–32, 94 L.Ed. 839 (1950) (plurality) (proportional racial limitation of grand jurors based on population is unconstitutional); N.J.Stat.Ann. § 2A:73–1 (West 1976) (imposing random procedure), the record indicates that the assignment judge who impaneled Ramseur's grand jury tried to limit the number of African–American jurors to coincide with his subjective and arbitrary notion of the proportion of African–Americans in the Essex County population. During grand jury selection, he stated at the outset that "[i]t is my purpose to try to pick a cross section of the community," and afterward stated, "I have asked two of the blacks who have indicated a

willingness to serve to sit in the body of the courtroom. I am deliberately trying to get an even mix of people from background and races, and things like that." App. at 2429, 2449. During the hearing on Ramseur's allegations, the judge testified that his idea of a cross-section of Essex County was people of different races and vocations, and therefore he tried to select a "great variety" of people to serve on the grand jury. App. at 3897. Though he did not specify exact numbers, the assignment judge was trying to get a racial cross-section on the jury, even if he also was trying to get cross-sections based on factors other than race. The judge could not obtain what he considered an appropriate racial balance without, at least temporarily, excluding two or more qualified African–American jurors.[3] Even if he was not motivated by malice toward any race, the judge's attempt to proportionally limit the number of African–Americans on the jury is purposeful discrimination in violation of the Equal Protection Clause.

In *Cassell,* the Supreme Court found purposeful discrimination where jury commissioners (1) limited the number of African–American grand jurors to one per panel to reflect the proportion of African–Americans in the general population, and (2) testified that no African–Americans appeared on the list from which the defendant's grand jury was selected because they did not know any qualified African–Americans. 339 U.S. at 286–90, 70 S.Ct. at 631–33. Admittedly, the second fact is absent from this case, as the assignment judge did impanel a grand jury containing qualified African–Americans. However, the Court in *Cassell* clearly stated that the practice of proportional racial limitation, by itself, constitutes unlawful racial discrimination. *Id.* at 286–87, 70 S.Ct. at 631–32. The assignment judge violated Ramseur's equal protection rights by engaging in that practice.

---

**3.** The other assignment judge in Essex County testified that he tried to achieve a 50–50 balance between white and non-white grand jurors because he believed that the county population was forty percent African–American. App. at 3828–30. His goal "was to try to make a generally even balance between the races based upon the percentage as [he] understood was the population division in the County of Essex." App. at 3830. The testimony of both assignment judges indicates that it was a common practice in Essex County at that time to proportionally limit the number of African–Americans that could serve on a grand jury.

The majority draws comfort from the fact that the judge excused a juror who admitted that she was prejudiced against certain races. Unfortunately, the judge's intolerance of racism in its crudest and most obvious form did not prevent him from engaging in a more subtle form of racism by treating African–Americans less favorably than whites during jury selection.

This sort of constitutional error cannot be cured by the mere assertion of good intentions or "harmless error." The Supreme Court consistently has rejected arguments that a conviction may be affirmed regardless of racial discrimination in the selection of the grand jury. *Vasquez v. Hillery*, 474 U.S. 254, 261, 106 S.Ct. 617, 622, 88 L.Ed.2d 598 (1986); *Rose*, 443 U.S. at 559, 99 S.Ct. at 3001; *Cassell*, 339 U.S. at 290, 70 S.Ct. at 633; *see also* Charles A. Wright, *Federal Practice and Procedure* § 855 (1982) (harmless error analysis cannot be used "if there has been purposeful discrimination in the selection of grand and petit jurors"). Indeed, the Court has called such discrimination "a grave constitutional trespass" and has stated that requiring a state to retry a defendant, even if it is many years after his original conviction, is not unduly burdensome to the state. *Vasquez*, 474 U.S. at 262, 106 S.Ct. at 622. The Court's holding in *Vasquez* recently has been cited in dicta, demonstrating the Court's continued commitment to impartiality and equal participation by all in our judicial system. *See Arizona v. Fulminante*, — U.S. ——, ——, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991) ("Since our decision in *Chapman*, other cases have added to the category of constitutional errors which are not subject to harmless error the following: unlawful exclusion of members of the defendant's race from a grand jury...."); *Teague v. Lane*, 489 U.S. 288, 328, 109 S.Ct. 1060, 1084, 103 L.Ed.2d 334 (1989) (Brennan, J., dissenting on other grounds) (*Vasquez* and *Rose* held that prisoners could seek habeas review of grand jury discrimination claims, and that such claims are not subject to harmless error).

Moreover, the Court in *Rose* specifically stated that we need not inquire into whether the defendant was "prejudiced in fact" by the discriminatory procedures used in the selection of the grand jury. 443 U.S. at 556, 99 S.Ct. at 3000. Prejudice in fact to the defendant is not required because our concern is not limited to harm to the defendant and because "proof of actual harm or lack of harm is virtually impossible to adduce." *Peters*, 407 U.S. at 504, 92 S.Ct. at 2169.

Though the defendant need not have suffered an outcome-determinative injury, I believe that discriminatory grand jury selection procedures like the one in this case increase the risk of the grand jurors' discriminating against a defendant on the basis of race and possibly could lead to an erroneous indictment. I have no doubt that if the assignment judge instructed the grand jury that it is permissible to treat African–Americans differently in the administration of justice, this court would have granted Ramseur's petition. But for all practical purposes, the judge conveyed exactly that same message to the jurors through his actions. In full view of the grand jury, he treated prospective African–American jurors less favorably than prospective white jurors. The white persons who expressed a willingness to serve were seated in the panel, while some of the African–American persons who expressed a willingness to serve were forced to sit aside until, as a last resort, they were needed because no more whites were available. Such actions imply that African–Americans are less fit to serve on the jury and are therefore inferior to whites. Because the defendant also is an African–American, the stigmatizing of members of his race is likely to bias the jury against him.

The majority also states that the analytical focus of discriminatory selection claims is upon the opportunity to deliberate as jurors. Although at least two of the temporarily excluded African–Americans eventually served as jurors, their ability to fully participate may have been handicapped by the discrimination in the selection process. In this case, an African–American defen-

dant got to have African–American grand jurors on the panel which indicted him, but only after some of those jurors were humiliated, degraded, and possibly intimidated in open court through less favorable treatment on account of their race. The judge's actions show that even in a court of law, African–Americans may be treated as second-class citizens. The judge's treatment of them may have caused the other grand jurors (particularly the white grand jurors) to regard them as inferior, rendering them less effective and influential when the grand jury deliberated.

Because jury selection procedures like the one before us infect court proceedings with racism and help to perpetuate negative stereotypes about African–Americans, I believe that Ramseur suffered a sufficiently concrete injury to give him standing to assert the equal protection rights of the temporarily excluded jurors. *See Powers,* —— U.S. at —— – ——, 111 S.Ct. at 1370–71 (third-party standing requires injury-in-fact, close relation between litigant and third party, and hindrance to third party's ability to protect his interests). In *Powers,* the Court concluded that the exclusion of a juror because of his race causes a cognizable injury to the defendant because it casts doubt on the integrity of the judicial process. *Id.* at ——, 111 S.Ct. at 1371. The Court stated:

> The overt wrong, often apparent to the entire jury panel, casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial of the cause.…
>
> The purpose of the jury system is to impress upon the criminal defendant and the community as a whole that a verdict of conviction or acquittal is given in accordance with the law by persons who are fair. The verdict will not be accepted or understood in these terms if the jury is chosen by unlawful means at the outset.

*Id.* at —— – ——, 111 S.Ct. at 1371–72. Though this case, perhaps, does not involve actual exclusion of a juror because of race, the injury caused by the temporary exclusion of prospective African–American jurors is essentially the same as the injury

recognized in *Powers:* by tainting the proceedings with discrimination in full view of the jury, the fairness of the criminal justice system which indicted and convicted Ramseur is called into doubt.

The other two requirements for third-party standing—close relation between the defendant and juror, and hindrance to the juror's protecting his rights—are easily met. Ramseur and the temporarily excluded jurors have a common stake in eliminating racial discrimination from the courtroom. *Id.* at ——, 111 S.Ct. at 1372. This congruence of interests is sufficient to satisfy the *Powers* test. *Id.* Finally, the Supreme Court has recognized that the barriers to a civil suit by jurors with an equal protection claim are "daunting," given the small financial stake involved and the economic burdens of litigation, and therefore constitute a significant hindrance to the jurors' protection of their rights. *Id.* at ——, 111 S.Ct. at 1373; *McCollum,* —— U.S. at ——, 112 S.Ct. at 2357. By denying Ramseur's petition, the majority has made it almost impossible for anyone to challenge the use of objectionable grand jury selection procedures like the one employed in this case, because the defendant is the only person with a strong incentive to raise such a claim. *See Powers,* —— U.S. at ——, 111 S.Ct. at 1373; B. Underwood, *Ending Race Discrimination in Jury Selection: Whose Right Is It, Anyway?,* 92 Colum.L.Rev. 725, 757 (1992).

I fear that the practical result of the majority's opinion will be to encourage and tolerate discrimination in the courtroom. The discriminatory grand jury selection procedure upheld today was used for decades in Essex County, New Jersey, and procedures like it are probably still being used in courts throughout the country. In some ways, the procedure used to impanel Ramseur's grand jury was even more shocking than the use of race-based peremptory challenges outlawed in *Batson* and *McCollum,* because in this case the discriminatory acts were committed by the judge rather than one of the advocates. Contrary to the majority's assertion, I believe that the imprimatur of the state was

forcefully given to discriminatory actions. If a judge in a court of law will not treat whites and African–Americans as equals, I do not see how we can expect better conduct of ordinary citizens. The majority's opinion is a setback in our society's quest to eliminate discrimination from its justice system.

For these reasons, I would remand this matter to the district court with instructions to grant the writ of habeas corpus, conditioned upon Ramseur's not being reindicted within ninety days from the date of the district court's order granting the writ.

Judge Mansmann and Judge Nygaard join me in this dissenting opinion.