UNITED STATES of America

v.

**Crispited ORTIZ, et al.**

**Crim. A. No. 95–10.**

United States District Court,
E.D. Pennsylvania.

Aug. 17, 1995.

Geoffrey V. Seay, Philadelphia, PA, Carol A. Carson, Philadelphia, PA, Peter A. Levin, Philadelphia, PA, Joseph P. Capone, Philadelphia, PA, Steven A. Morley, Philadelphia, PA, William J. Brennan, Philadelphia, PA, Guillermo L. Bosch, Collegeville, PA, Wayne Sachs, Philadelphia, PA, Peter Weidman, Kaufman, Coren & Ress, Philadelphia, PA, Michael A. Wenof, Philadelphia, PA, Raul I. Rivera, Philadelphia, PA, Jose Ongay, Philadelphia, PA, Joel P. Trigiani, Philadelphia, PA, Marc Cedrone, Philadelphia, PA, Mark E. Cedrone, Carroll & Cedrone, Philadelphia, PA, Hope C. Lefeber, Philadelphia, PA, Marc Neff, Moldovsky & Neff, Philadelphia, PA, L. Felipe Restrepo, Krasner & Restrepo, Philadelphia, PA, Brian J. McMonagle, Alva and McMonagle, Philadelphia, PA, Jeffrey M. Lindy, Stradley, Ronon, Stevens & Young, Philadelphia, PA, Jeremy H. Gonzalez Ibrahim, Philadelphia, PA, Edward J. Daly, Law Offices of Edward J. Daly, Philadelphia, PA, Mark C. Levy, Saul, Ewing, Remick & Saul, Philadelphia, PA, Teresa Carr Deni, Philadelphia, PA, Dolores M. Troiani, Paoli, PA, Barnaby C. Wittels, Stephen Robert La Cheen and Assoc., Philadelphia, PA, and Joshua M. Briskin, Philadelphia, PA, for defendants.

Francis C. Barbieri, Jr., U.S. Attorney's Office, Philadelphia, PA, for the U.S.

## MEMORANDUM

BARTLE, District Judge.

This criminal action involves over 20 defendants alleged to have committed various drug offenses. Defendant Hector Medina together with other defendants has filed a motion to dismiss the indictment pursuant to Rules 6(b) and 12(b) of the Federal Rules of Criminal Procedure.[1] They contend that the selection procedures for grand juries in the Eastern District of Pennsylvania and specifically the grand jury which returned the indictment in this case did not represent a fair cross section of the community. Specifically, defendants argue that Hispanics were underrepresented. The court held a hearing on this issue on July 11 and 21, 1995.

The United States District Court for the Eastern District of Pennsylvania, at the time in question, obtained the names of potential grand jurors for the master wheel from the voter registration lists for the ten counties[2] that comprise the district. The percentage of the names selected from each county was the same as the percentage of the district's registered voters that reside in each county. Thus, if a county had 10% of the registered voters in the district, 10% of the potential jurors on the master wheel came from that county. The grand juries being challenged involve the 1993 master jury wheel used from approximately the summer of 1993 to the present. By order of then Chief Judge Louis Bechtle, 104,726 voters were placed in the master jury wheel. They were chosen at random and proportionally from each of the

---

**1.** Rule 6(b)(1) provides in pertinent part that: [t]he attorney for the government or a defendant who has been held to answer in the district court may challenge the array of jurors on the ground that the grand jury was not selected, drawn, or summoned in accordance with the law.... Rule 12(b) provides in relevant part that:

[a]ny defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion.

**2.** The ten counties are Philadelphia, Berks, Bucks, Chester, Delaware, Lancaster, Lehigh, Montgomery, Northampton, and Schuylkill.

ten counties by means of a computer. The master wheel was then further broken down randomly by computer into four wheels (wheels 1, 2, 3, and 4) of approximately 26,000 persons each. These wheels were used in numerical order, with persons on wheel 1 being sent jury questionnaires in May, 1993 and persons on the other wheels being sent the jury questionnaires at a later time. Second and third mailings were made to persons who did not return the questionnaire on the previous request. If a question was left unanswered on the returned questionnaire, it was sent back with an instruction to fill in the missing information. Finally, the clerk's office reviewed the completed forms to determine whether a person should be disqualified, exempt, or excused from jury duty. For example, persons who were not citizens, who could not read, write, and speak English, who were under 18 years old, who had certain types of physical or mental disabilities, or who were felons were disqualified. Those not disqualified, exempt, or excused comprised what was known as the qualified jury wheel and were subject to call as jurors.

During the relevant period, two different forms were used. Both forms asked a person's race. The difference in the forms related to the placement of the question on ethnicity. On the first form, the question "Are you Hispanic?" was placed within the same box as a question asking for the prospective juror's race. If a person did not answer the Hispanic ethnicity question, the questionnaire was not sent back as incomplete, since presumably the person had checked another box as to race. On the second form, the Hispanic ethnicity question was set forth separately from the race question. Now it was clearer that a person was required to answer both as to race and as to Hispanic ethnicity. Some of the persons on the master list at issue were sent the first type of questionnaire while others on later wheels received the questionnaire with the Hispanic question more clearly separated from the race question.[3] Only 22.6% of qualified jurors who returned the old form answered the question "Are you Hispanic?" versus 79.8% of qualified jurors who returned the new form.

According to the 1990 United States census, the Hispanic population of the Eastern District of Pennsylvania comprised 2.9% of the total population. However, Hispanics who are United States citizens comprised only 2.59% of the district's total population.[4] The defendants' expert on demography, Eugene Ericksen ("Ericksen"), testified that because the Hispanic population grew at a faster rate than the non-Hispanic population between 1980 and 1990, he believed that Hispanics today would constitute 3.2% of the district's total population.

Ericksen testified that Hispanics comprised 2.13% of the master grand jury list while the government's expert on demography, Samuel Preston ("Preston"), stated that Hispanics made up 2.41% of the master list. Preston also reported that the percentage of Hispanics in the district who were citizens and spoke English well was 2.02%. Ericksen found that Hispanics constituted 1% of the qualified grand jury pool while Preston testified that Hispanics made up 1.28% of the qualified pool. These numbers for the qualified jury pool lead to an absolute disparity[5] of 1.6% (2.59% minus 1.0%) according to the defense and 0.74% (2.02% minus 1.28%) according the government. The comparative disparity[6] is 61.54% under the defense numbers and 36.63% under the government's numbers.

3. The testimony at the hearing revealed the second mailing for wheel 2, done in December, 1994, included the new form although some copies of the old form were also sent out in this mailing.

4. Voter registration forms outside of Philadelphia County do not contain any information concerning race or ethnicity, making it necessary to rely on census data. The Philadelphia County form simply asks if the person is black, white, or other.

5. Absolute disparity is the difference between a group's percentage in the population and its percentage on the master jury wheel or in the qualified pool.

6. Comparative disparity is determined by dividing the absolute disparity by the group's percentage in the general population.

■ Defendants assert that the selection process for the master jury wheel, for the qualified jury wheel, and thus for the grand jurors violated the Fifth Amendment.[7] A Fifth Amendment violation is established if: (1) there is a "recognizable, distinct class, singled out for different treatment under the laws;" (2) this group is underrepresented over a significant period of time; and (3) the procedure utilized to select the jurors is "susceptible of abuse or is not racially neutral." [8] *Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977) (citations omitted).[9]

■ Defendants have not established that the Fifth Amendment was violated. They clearly have not made a showing as to the second element. As the Court of Appeals for the Third Circuit explained in *Ramseur v. Beyer,* 983 F.2d 1215, 1233 (3d Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993), "studies which have been found to satisfy *Castaneda's* requirement of a 'significant period of time' have covered periods substantially longer than the two years covered by this study." Here, defense counsel presented evidence concerning underrepresentation only for a two year time period, from the summer of 1993 until the present. Moreover, no evidence was presented that demonstrated that the method used in this district is susceptible of abuse by court personnel or is not racially neutral. The Court of Appeals has noted that voter registration and department of motor vehicle lists "are constituted using facially neutral criteria and allow no opportunity for subjective or racially motivated judgments." *Ramseur,* 983 F.2d at 1233 (citation omitted). In fact, defense counsel conceded at the hearing that they were not arguing that intentional discrimination or racially motivated judgments had occurred here.

■ Defendants also claim that the jury selection procedure in this district at the relevant time period violated the Sixth Amendment [10] of the United States Constitution and the Jury Selection and Service Act of 1968 ("Act"), 28 U.S.C. § 1861 *et seq.*[11] The Sixth Amendment "requires that jurors be drawn from pools that represent a 'fair cross section' of the community." *Ramseur,* 983 F.2d at 1230. The Act provides that grand juries be "selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. Under the Act, "such plan [for random selection of grand and petit jurors] shall—specify whether the

---

7. The Fifth Amendment provides in pertinent part:

No person shall ... be deprived of life, liberty, or property, without due process of law.... We assume that defendants are objecting to the grand jury selection process as violating the Fifth Amendment's due process clause. Although the Fifth Amendment does not contain an equal protection clause, the Supreme Court has explained that it approaches Fifth Amendment equal protection claims in the same manner that it examines Fourteenth Amendment equal protection claims. *Weinberger v. Wiesenfeld,* 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975).

8. The government argues that the defendants must also prove purposeful discrimination in order to prevail in a Fifth Amendment challenge, citing *Ramseur v. Beyer,* 983 F.2d 1215, 1226 (3d Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993). However, we read that requirement as only applying to challenges to the selection of actual members for the grand jury pursuant to *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), rather than to the procedures used to cull potential grand jurors.

9. Although *Castaneda* involved an equal protection claim under the Fourteenth Amendment, its recitation of the test for an equal protection violation applies to a claim under the Fifth Amendment due process clause. As explained above, the Supreme Court approaches Fifth Amendment equal protection claims in the same manner that it examines Fourteenth Amendment equal protection claims. *Weinberger,* 420 U.S. at 638 n. 2, 95 S.Ct. at 1228 n. 2.

10. The Sixth Amendment provides in pertinent part that:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed....

11. Section 1861 provides in relevant part that:

It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes.

names of prospective jurors shall be selected from the voter registration lists or the lists of actual voters of the political subdivisions within the district or division." 28 U.S.C. § 1863(b)(2). The voter registration lists are to be supplemented "where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 of this title."[12] *Id.* Thus, supplementation is the exception rather than the rule. *United States v. Cecil,* 836 F.2d 1431, 1451 (4th Cir.1988) (quotation omitted), *cert. denied,* 487 U.S. 1205, 108 S.Ct. 2846, 101 L.Ed.2d 883 (1988).

The Sixth Amendment is violated when: (1) there is a " 'distinctive' group in the community;" (2) that the representation of the group is "not fair and reasonable in relation to the number of such persons in the community;" and (3) that "this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). The test for showing underrepresentation under the Act is the same as that for the Sixth Amendment. *United States v. Rodriguez,* 776 F.2d 1509, 1510 n. 1 (11th Cir.1985) (citation omitted); *United States v. Musto,* 540 F.Supp. 346, 354 n. 1 (D.N.J.1982) (citation omitted), *aff'd sub nom. United States v. Aimone,* 715 F.2d 822 (3d Cir.1983), *cert. denied,* 468 U.S. 1217, 104 S.Ct. 3585, 3586, 82 L.Ed.2d 883 (1984).

▆ In order for a valid claim to exist under the Sixth Amendment and under the Act, there must be a "distinctive group" involved. *Duren,* 439 U.S. at 364, 99 S.Ct. at 668; *Rodriguez,* 776 F.2d at 1510 n. 1; *Musto,* 540 F.Supp. at 354 n. 1. Are Hispanics a distinctive group and if so how is an Hispanic defined? Both expert witnesses agreed that Hispanics are not a race. There are both white and black Hispanics. The government's expert Preston testified that since 1970 the principal means of identifying the Hispanic population has been self-identification. Preston explained that Hispanics are not solely of one race, with about 5% of Hispanics classifying themselves as black and the remainder as white. Moreover, Preston

reported that the background of Hispanics in this country is quite varied apart from some use of the Spanish language, at least in the past.

Defendants' expert Ericksen similarly explained that whether or not a person is an Hispanic is not a biological characteristic but a psychological characteristic as to how one identifies himself or herself. It is not simply whether one has some Spanish ancestry or whether one speaks Spanish as a first language. As Ericksen explained, if an Hispanic man married an admittedly non-Hispanic woman and they had children, the children would have to make a decision about whether they would identify themselves as Hispanic. According to Ericksen, factors such as whether the children are living with the father, how they feel about themselves, and the neighborhood where they live would influence whether the children would identify themselves as Hispanic. A person's surname is not a definite indicator. Some last names of persons who may consider themselves Hispanic may not be or may not appear to be of Spanish derivation. Conversely, a woman of admittedly non-Hispanic descent may take her husband's Hispanic surname upon marriage. Suffice it to say that whether a person is Hispanic in the final analysis depends on whether that person considers himself or herself Hispanic.

The parties have not presented a generally accepted meaning of the term "Hispanic" and the jury questionnaires did not attempt it. Whatever the definition is, it clearly encompasses persons of different races. We need not decide whether Hispanics are or can be a "distinctive group," cognizable under the law, or who is included within the group. Even assuming that Hispanics are a distinctive group and the defendants' statistics are accurate, we find no constitutional or statutory violation.

The Court of Appeals for the Third Circuit has previously ruled in a case on the alleged underrepresentation of blacks on grand juries. In *United States v. Lewis,* 472 F.2d

---

**12.** Section 1862 provides that:

[n]o citizen shall be excluded from service as a grand or petit juror in the district courts of the United States or in the Court of International Trade on account of race, color, religion, sex, national origin, or economic status.

252, 255 (3d Cir.1973), the defendant challenged the jury selection plan of the Western District of Pennsylvania, which relied solely on voter registration lists. The defendant argued that the voter registration lists did not provide a fair cross section of the community because "blacks in the Pittsburgh Division do not register to vote." *Id.* at 256. The Court of Appeals held that "a group of persons who choose not to vote do not constitute a 'cognizable group.' Further, their non-registration is a result of their own inaction; not a result of affirmative conduct by others to bar their registration." *Id.* Although defendants argue that *Lewis* has been indirectly overruled, we cannot find any support for that proposition nor have the defendants given any legal citation for this argument. In fact, the Court of Appeals for the Fourth Circuit, faced with a challenge to a plan solely utilizing voter registration lists, explained that:

> [t]he authorities cited, from practically every Circuit including our own, in many of which certiorari has consistently been denied by the Supreme Court, as well as the legislative intent expressed in the Jury Selection Act itself, as found by the courts, categorically establish that there is no violation of the jury cross-section requirement where there is merely underrepresentation of a cognizable class by reason of failure to register, when that right is fully open.

*Cecil,* 836 F.2d at 1448.

Defendants' reliance on *Duren,* 439 U.S. 357, 99 S.Ct. at 665, is without merit. The Supreme Court defined systematic exclusion as exclusion "inherent in the particular jury-selection process utilized." *Id.* at 366, 99 S.Ct. at 669. In that case, the Supreme Court found that women were systematically excluded in the grand jury selection process in Jackson County, Missouri. *Id.* at 367, 99 S.Ct. at 670. The jury questionnaire at issue permitted women to fill out a paragraph which would entitle them to an automatic exemption from jury service. *Id.* at 361, 99 S.Ct. at 667. Women who did not return the questionnaire were deemed to have claimed the exemption if they did not appear for their jury duty in Jackson County, although this

practice was not authorized by statute. *Id.* at 362 & n. 14, 99 S.Ct. at 667 & n. 14.

The case before this court is distinguishable. The jury selection system in *Duren* actively permitted women to exempt themselves from jury service by having the women fill out the paragraph requesting an exemption. Here, the system did not permit Hispanics to exempt themselves. Rather, defendants' expert Ericksen explained that Hispanics were less likely to return the questionnaires for three reasons. First, many Hispanics are poor. Like other poor people, they are apt to move more frequently than the more affluent, with their mail not being forwarded to their new address. Secondly, poor people in general have less reliable mail service. Finally, Ericksen reported that Hispanics were found to be less likely to return census questionnaires and thus presumably less likely to send back jury questionnaires. This testimony supports the finding that unlike *Duren* it was not the court's use of voter registration lists or the jury selection system itself which may have resulted in underrepresentation of Hispanics.

*Duren* is also distinguishable in terms of the point at which underrepresentation of the group occurs. As the Supreme Court noted in *Duren,* "[t]here was no indication that underrepresentation of women occurred at the first stage of the selection process—the questionnaire canvass of persons randomly selected from the relevant voter registration list." 439 U.S. at 366, 99 S.Ct. at 669. Rather, underrepresentation occurred at the next stage, where the jury wheel was constructed from the persons summoned for service. *Id.* The Court of Appeals for the Fourth Circuit has noted that *Duren* does not have "one word of criticism of the use of the voter registration lists in the opinion in that case." *Cecil,* 836 F.2d at 1449.

Defendants also cite to *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) as supporting their position. There, the Supreme Court found women to be systematically excluded from jury service. *Id.* at 531, 95 S.Ct. at 698. Under Louisiana law, women were not selected for jury service unless they previously filed a written request to be subject to such service. *Id.* at

523, 95 S.Ct. at 694. Again, the system there actively permitted women to exempt themselves by not filing such a declaration whereas the system in place in this district did not have any provision which authorized Hispanics to exempt themselves.

We find that no systematic exclusion of Hispanics occurred in the selection of grand jurors in this district. No intentional discrimination took place and defendants do not so argue. The use of voter registration lists did not cause any exclusion of Hispanics. Rather, it was the unfortunate failure of Hispanics either to register to vote or to return the jury questionnaires, through no fault or encouragement of the court's jury selection procedures, which may have produced any underrepresentation of Hispanics on grand juries. To the extent that the postal system is to blame, the district's use of voter registration lists cannot be held responsible. Whatever jury selection system is employed, the district must necessarily communicate by mail with people in order to implement it.

The jury selection system utilized at the relevant time period in the United States District Court for the Eastern District of Pennsylvania conformed to the Jury Selection and Service Act of 1968 and did not violate the Fifth or the Sixth Amendments to the Constitution. Accordingly, we will deny defendants' motion to dismiss the indictment.